In re CAROLINA MOTOR EXPRESS, INC. I.D. No. 56–1299892, Debtor.

Langdon M. COOPER, Trustee in Bankruptcy for Carolina Motor Express, Inc., and Mark & Associates of North Carolina, Inc., Plaintiffs,

v.

CALIFORNIA CONSOLIDATED ENTERPRISES, INC., and Peter C. Reiter, Defendants.

Bankruptcy No. SH–B–86–00226.
Adv. Nos. 86–0498, 87–0028.

United States Bankruptcy Court, W.D. North Carolina, Shelby Division.

March 16, 1988.

Joseph L. Steinfeld, Jr., Washington, D.C., Langdon M. Cooper, Gastonia, N.C., for plaintiffs.

Stuart R. Childs, Charlotte, N.C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARVIN R. WOOTEN, Bankruptcy Judge.

THESE MATTERS coming on to be heard and being heard before the undersigned Judge presiding over the United States Bankruptcy Court for the Western District of North Carolina, on February 16, 1988, at a bench trial on the Complaints of Langdon M. Cooper, Trustee in Bankruptcy for Carolina Motor Express, Inc., Debtor, and Mark & Associates of North Carolina, Inc., as Plaintiffs, seeking money damages against California Consolidated Enterprises, Inc. and Peter C. Reiter, Defendants, for the failure of Defendants to fully pay freight charges owed to the Debtor for services rendered by the Debtor to these Defendants; and the parties having stipulated to all facts at issue in these proceed-

ings and having agreed to consolidate these proceedings for trial; and the Court, after reviewing the record and stipulated facts in these proceedings, and after hearing the arguments of counsel, pursuant to Bankruptcy Rule 7052 makes the following FINDINGS OF FACTS AND CONCLUSIONS OF LAW:

## FINDINGS OF FACTS

These actions arose upon the filing of Complaints jointly by Langdon M. Cooper, the duly appointed qualified and currently serving Trustee of Carolina Motor Express, Inc., Debtor (hereinafter called the "Debtor") and Mark & Associates of North Carolina, Inc. (hereinafter called "Mark") against the Defendants who are former customers of the Debtor. Pursuant to an audit contract approved by this Court on July 15, 1986, Mark audited the Defendants' freight bills for the purpose of determining whether said bills were properly rated according to the common carrier tariffs that the Debtor had on file with the Interstate Commerce Commission (ICC) and which were in effect at the date of each shipment.

The Debtor operated at all times under consideration in these proceedings as a motor common carrier transporting freight in interstate commerce pursuant to authority issued by the ICC. As such, the Debtor was required to charge all of its customers pursuant to the tariffs it has on file with the ICC. The Debtor however, did not initially charge the Defendants in these proceedings its published tariff rates.

Defendant, California Consolidated Enterprises, Inc. (hereinafter called "CCE"), is a California corporation with a principal place of business at 14704 Radburn, Santa Fe Springs, California.

The Debtor's employees or agents, as an inducement to secure CCE's business, orally quoted to CCE certain freight rates and charges for the transportation of specified commodities between named origin and destination points. The quoted freight rates and charges were discussed by CCE and the Debtor's agents in various telephone conversations between them, and were set forth in a letter.

Following the completion of the negotiations between the parties, the quoted freight rates were accepted by CCE. During those negotiations the Debtor's agents or employees represented to CCE that the quoted freight rates and charges would cover the period that the shipments moved. CCE believed that the Debtor would publish the quoted freight rates in its tariffs filed with the ICC. CCE asked the Debtor for a copy of its tariff, but it was never produced.

The Debtor's original freight bills for the shipments confirmed the negotiated freight rates.

CCE was billed for the shipments at the negotiated rate, and CCE has paid to the Debtor all the original transportation charges for the shipments, with the exception of an uncontested balance owing the Debtor of $4,804.55 for previous unpaid invoices.

After CCE had made payment of the original transportation charges, the Plaintiffs billed CCE higher rates and charges for the same shipments, alleging that the higher freight rates and charges were those actually stated in the pertinent tariffs filed with the ICC during the period from December of 1983 through April of 1986, when the shipments moved. The orally quoted, agreed upon, and confirmed freight rates and charges were never published by the Debtor in tariffs filed with the ICC.

Based on the negotiated freight rates and charges agreed upon by the parties, and which were originally assessed by the Debtor, on the shipments paid in full by CCE, CCE unreasonably relied on the representation of the employees and agents of the Debtor, and utilized the Debtor, instead of other available motor carriers, and failed to make any reasonable investigation, or check with regard to the legal tariffs, all of which they were equipped by knowledge and experience so to do, in short, through blind and unreasonable faith, Defendants participated in the illegal action of the

Debtor to the detriment of the then Debtor entity.

Defendant, Peter C. Reiter (hereinafter called "Reiter") is a sole proprietorship with a principal place of business at 1041 Parakeet Circle, Fountain Valley, California.

The Debtor's employees or agents, as an inducement to secure Reiter's business, orally quoted to Reiter certain freight rates and charges for the transportation of specified commodities between named origin and destination points. The quoted freight rates and charges were discussed by Reiter and the Debtor's agents in various telephone conversations between them, and were set forth in a letter. During the negotiations the Debtor's agents or employees represented to Reiter that the quoted freight rates and charges would cover the period that the shipments moved. Following the completion of the negotiations between the parties, the quoted freight rates were accepted by Reiter. Reiter believed that the Debtor would publish the quoted freight rates in its tariffs filed with the ICC. Reiter asked the Debtor for a copy of its tariff, but it was never produced, on the grounds that it was too "voluminous."

The Debtor's original freight bills for the shipments confirmed the negotiated freight rates and charges.

Reiter was originally billed for the shipments at the negotiated rate, and Reiter paid to the Debtor these original bills in full.

After Reiter had made payment of the original transportation charges, the Plaintiffs billed Reiter higher rates and charges for the same shipments, alleging that the higher freight rates and charges were those actually stated in the pertinent tariffs filed with the ICC during the period from January of 1985 through April of 1986, when the shipments moved.

The orally quoted, agreed upon, and confirmed freight rates and charges were never published by the Debtor in tariffs filed with the ICC.

Based on the negotiated freight rates and charges agreed upon by the parties, and which were originally assessed by the Debtor, on the shipments paid in full by Reiter, Reiter unreasonably relied on the representation of the employees and agents of the Debtor, and utilized the Debtor, instead of other available motor carriers, and failed to make any reasonable investigation, or check with regard to the legal tariffs, all of which they were equipped by knowledge and experience so to do, in short, through blind and unreasonable faith, Defendants participated in the illegal action of the Debtor to the detriment of the then Debtor entity.

Both defendants are ICC licensed brokers who, pursuant to 49 C.F.R. Section 1045.10, are bound by laws and ICC regulations concerning the payment of freight charges.

Pursuant to the freight bill audit contract, Mark audited all of the shipments handled by the Debtor for each of the Defendants by comparing the commodities, weights, points of origin, destination and declared value of each shipment to the applicable common carrier tariff rate which the Debtor had on file with the ICC, and which was in effect on the date of each shipment was handled for each Defendant.

The results of said audit produced balance due invoices in the amounts of $58,-793.03 owed by CCE and $13,795.73 owed by Reiter.

In addition to these balance due freight bills, the audit performed by Mark also revealed that Defendant CCE had failed to pay original invoices in the amount of $24,-201.90. On March 31, 1987, CCE paid the Trustee $16,277.35 and submitted a proof of claim for $3,120.00, leaving an uncontested account receivable owed the Debtor of $4,804.55.

In response to the audit findings, Defendants claim that they dealt with the Debtor as a contract carrier, and that the rates agreed upon by themselves and the Debtor were part of an oral contract. Alternatively, CCE and Reiter claim that they dealt with the Debtor as a common carrier,

and relied upon the Debtor to file its negotiated rates with the ICC.

Additionally, each of the Defendants has moved the Court for referral to the ICC. The asserted purpose of the Defendants' requests for ICC referral is to obtain an advisory determination from the ICC as to whether or not the Debtor's practices were unreasonable, and whether the Trustee and Mark should be permitted to enforce the filed tariff rates. The Court previously denied CCE and Reiter's Motion for Referral to the ICC by Order entered March 25, 1987. These Defendants reasserted their Motions to Refer at trial.

The Defendants were aware at all times involved in this proceeding that the Debtor, when transporting freight as a common carrier, was required to charge for its transportation services pursuant to the tariffs it had on file with the ICC. The Defendants negotiated rates with the Debtor without obtaining a copy of the Debtor's tariffs to verify that the Debtor had, indeed, filed these negotiated rates with the ICC.

While Defendants also raise as defense that they dealt with the Debtor as a contract carrier, none of the Defendants executed written, bilateral contracts with the Debtor which imposed specific obligations upon both the Debtor and each of the Defendants, and which covered a series of shipments as required by the regulations for contract carriage codified at 49 C.F.R. 1053.1

In addition, the Defendants have failed to show that they had any agreement with the Debtor which provided that the Debtor would dedicate equipment for a continuing period of time for their exclusive use, or provide special equipment or services designed to meet the Defendants' distinct needs, as required for contract carriage under the Interstate Commerce Act. 49 U.S.C. Section 10102(15).

The Debtor's contract carriage Permit also provides that the Debtor may operate as a contract carrier only so long as the Debtor executes contracts pursuant to 49 C.F.R. 1053. The Permit further states that while it is unnecessary to file the contracts with the ICC "the execution of contracts must be accomplished".

Since the Court finds that there is no valid contract carriage, and since the parties have previously stipulated that the audit performed by Mark resulted in the lowest applicable common carrier charges, the Court adopts the audit findings by Mark as proper in all respects.

Each of the Defendants was billed for the shipments at the negotiated rate, and each Defendant paid the Debtor its original transportation charges with the exception that at trial CCE still owed the Debtor $4,804.55.

■ Although each of the Defendants claimed it relied upon the Debtor to file the negotiated rates, the Court finds that such reliance was not reasonable as each of the Defendants is a sophisticated shipper, who was dealing with a sophisticated carrier. All of the parties knew the rules and regulations concerning tariff filings and yet they proceeded to conduct business as if there were no such requirements.

■ The Court further finds and concludes that even if the Defendants' reliances were to be considered reasonable, and facts were developed sufficient to constitute "fraud" on behalf of the Debtor, the Court finds that the "filed rate" doctrine precludes the assertion of "equitable defenses" such as detrimental reliance or fraud, and that the Plaintiffs are entitled to recover regardless of the conduct of the Debtor.

■ The Debtor has a tariff provision on file with the ICC which provides, effective June 16, 1985, that a late payment charge of 1.25% per month is to be applied to all freight bills which are not paid within fifteen (15) days of delivery. This tariff also provides that the Debtor is entitled to reimbursement of reasonable attorney's fees in the amount of 33% of the transportation charges and late payment charges should payment not be made within thirty (30) days of presentation of freight bills. The Court finds that this tariff provision is applicable only with respect to the original

accounts receivable owed by CCE. The Court will not approve attorney's fees or interest on any of the undercharged amounts.

## DISCUSSION AND CONCLUSIONS OF LAW

These matters arise from Title 11 (11 U.S.C. Sections 101, et seq.) and were properly called for trial before this Court on January 16, 1988, after notice to all parties, and this Court had jurisdiction over these adversary proceedings pursuant to 28 U.S.C. Section 1334, said proceedings having been properly referred by this Court pursuant to 28 U.S.C. Section 157(a). Furthermore, this Court finds that these adversary proceedings are related to the case under Title 11 and are properly before this Court pursuant to 28 U.S.C. Section 157(c).

At pre-trial conferences, the Court asked the parties whether they desired to have these proceedings handled as dispositive matters or subject to *de novo* review by the District Court as provided in 28 U.S.C. Section 157(c). The Court notes from the record in these proceedings that all parties agreed to have the Court issue dispositive rulings pursuant to 28 U.S.C. Section 157(c)(2).

*Since There Is No Written Bilateral Contract Between the Debtor and Each of the Defendants, As A Matter of Law There Can Be No Contract Carriage Relationship Between the Parties*

 It is well settled that a carrier can operate both as a common and contract carrier. *Regular Common Carrier Conference v. United States*, 803 F.2d 1186, 1189 (D.C.Cir.1986). A motor common carrier is defined by the Interstate Commerce Act as "a person holding itself out to the general public to provide motor vehicle transportation for compensation over regular or irregular routes, or both." 49 U.S.C. Section 10102(14). In contrast, a motor contract carrier is defined as:

a person providing motor vehicle transportation of property for compensation under *continuing agreements* with one or more persons—(i) by assigning motor vehicles for a continuing period of time

for the *exclusive use* of each such person; or (ii) designed to meet the *distinct needs* of each such person. (Emphasis supplied).

49 U.S.C. Section 10102(15)(B).

"Continuing agreements" is defined in the Code of Federal Regulations as meaning a *written, bilateral* agreement. 49 C.F.R. Section 1053.1. This regulation provides in pertinent part that no contract carrier shall transport property for hire in interstate or foreign commerce,

... except under special and individual contracts or agreements which shall be in *writing*, shall provide for transportation for a particular shipper or shippers, shall be *bilateral* and impose specific obligations upon *both* carrier and shipper or shippers, shall cover a *series of shipments* during a *stated period of time* in contrast to contracts of carriage governing individual shipments, ... (Emphasis supplied).

 Each Defendant has stipulated that it failed to execute a written, bilateral contract, imposing specific obligations on both itself and the Debtor and covering a series of shipments. (Stip. Nos. 23, 37, 57 and 63). Instead, the Defendants claim to have relied upon the Debtor's oral quotations, or in some instances, written quotations and the original freight bills, to "confirm" the belief that a contract was created. As indicated in the regulation, a "contract" limited to the freight bills and bills of lading is specifically excluded from the definition of contract carriage. Also, a quotation letter, or other written offer is precluded as not "bilateral," and not imposing specific obligations upon the shippers.

Besides failing to comply with the spirit and intent of the ICC Regulations governing contract carriage, the Defendants and the Debtor failed to comply with the preconditions outlined in the Debtor's contract carriage permit (attached as Exhibit "B" to the Stipulated Facts). On the face of the Permit it is clearly stated: "this authority will be effective as long as the carrier maintains compliance with the requirements pertaining to ... the execution of contracts (49 C.F.R. 1053)." The Permit

further states "while the *execution of contracts must* be accomplished, it is unnecessary to file them with the Commission." (Emphasis supplied). The Defendants admit in the Stipulation of Facts that there are no "executed" contracts governing the involved transportation.

A further analysis of each of the Defendants' contract carriage claim reveals the weakness of their arguments. CCE bases its contract carriage claim on the oral representations of the Debtor (i.e. rate quotes) and one letter written by the Debtor's Director of Sales (Exhibit "D" to the Stipulated Facts). The letter makes no mention that the Debtor seeks to handle CCE's freight as a contract carrier, nor does the letter contain a promise on behalf of CCE to tender the Debtor even a single shipment of freight. The letter also fails to indicate that the Debtor will provide CCE with any specialized service, or dedication of equipment as is required by the statutory definition of contract carriage. 49 U.S.C. Section 10102(15).

Similarly, Defendant Reiter relies solely upon a rate quotation letter of the Debtor (letter attached as Exhibit "E" to the Stipulated Facts). In this letter, the Debtor's Director of Operations refers to the Debtor's operating *certificate* (i.e. common carrier certificate). He does not mention that the Debtor had contract carrier authority (which it did not obtain until 77 days after this letter was written) or that a copy of the contract carriage *permit* was enclosed with the letter. Also, the letter implies that the Debtor will be charging Defendant Reiter a rate which is not contained in its tariffs. Reiter stipulated that it was aware that the law and ICC regulations required the Debtor to charge its tariff rates. (Stip. No. 30). The fact that Reiter chose not to obtain copies of the Debtor's rates prior to engaging the Debtor indicates that its reliance upon the Debtor to file the negotiated rates was not reasonable. Also, the letter does not indicate that the Debtor will provide Reiter with any specialized service or dedication of equipment.

In *West Coast Truck Liners, Inc. v. Kaiser Aluminum and Chemical Co.*, 1987 Fed.Carr.Cas. (CCH) para. 83,336 (N.D.Cal. 1987), the District Court explained the need for a written contract for carriage to apply:

> A 'continuing agreement' has been interpreted to mean a *written* bilateral agreement 49 C.F.R. Section 1053.1 (1982). Under the oral agreement West Coast was providing its services as a motor *common* carrier while under the transportation agreement, West Coast acted as a motor *contract* carrier.

*Id.*, at p. 58,487.

In *West Coast* the Court found that although the Plaintiff motor carrier had both common and contract carriage authority so long as it was handling goods pursuant to, "an *oral* agreement; it was acting as a 'motor common carrier,' not as 'motor contract carrier.' *See* 49 C.F.R. Section 1053.-1. Therefore, the filed rate doctrine applies." *Id.* at p. 58,488.

The facts here just do not fit contract carriage. It is a pure and simple matter of common carriage and the Defendants' arguments for the finding of a contract carriage arrangement between the parties must fail.

*The Defendants' Characterization of Plaintiffs' Actions For Freight Undercharges Pursuant to Properly Filed Tariffs As An Unreasonable Practice Contravenes Clear Legal Precedent*

The United States Supreme Court has consistently held that carriers subject to the Interstate Commerce Act must collect, and shippers must pay, all lawful charges set forth in the applicable tariffs. In *Louisville & N.R.R. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915) the Court said:

> Under the Interstate Commerce Act, the rate of the carrier duly filed is the *only* lawful charge. *Deviation from it is not permitted upon any pretext.* (Emphasis supplied).

In *Armour Packing Co. v. U.S.*, 209 U.S. 56, 81, 28 S.Ct. 428, 435, 52 L.Ed. 681 (1908), the Court explained the rationale for the rigid rule of the filed rate doctrine:

If the rates (filed and published as required by law) are subject to secret alteration by special agreement, then the statute will fail of its purpose to establish a rate duly published, known to all, and from which neither shipper nor carrier may depart.

The Supreme Court has applied this rule of law every time it has addressed the issue of adherence to lawful common carrier rates. See, e.g., *Thurston Motor Lines v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 534–35, 103 S.Ct. 1343, 1344, 75 L.Ed.2d 260 (1983) (carrier has absolute right to collect tariff charges on every shipment); *Southern Pacific Transportation Co. v. Commercial Metals Co.*, 456 U.S. 336, 343–44, 102 S.Ct. 1815, 1820–21, 72 L.Ed.2d 114 (1982) (equitable defense of carrier's violation of ICC credit regulations rejected); *Baldwin v. Scott County Milling Co.*, 307 U.S. 478, 484–85, 59 S.Ct. 943, 947–48, 83 L.Ed. 1409 (1939); *Louisville & N.R.R. v. Central Iron & Coal*, 265 U.S. 59, 65, 44 S.Ct. 441, 442, 68 L.Ed. 900 (1924) (no contract of carrier can reduce the amount legally payable for transportation of freight in interstate commerce); and *Louisville & N.R.R. v. Rice*, 247 U.S. 201, 202, 38 S.Ct. 429, 429, 62 L.Ed. 1071 (1918) (where the Court stated that a carrier's claim is, of necessity, predicated on the tariff—not an understanding with the shipper).

The U.S. Courts of Appeal have also consistently applied the "filed rate doctrine". See *Inman Freight Systems, Inc. v. Olin Corp.*, 807 F.2d 117 (8th Cir.1986) (estoppel defense of detrimental reliance rejected as deviation from filed rate is not permitted under any pretext); *Farley Transportation Co. v. Santa Fe Trail Transportation Co.*, 778 F.2d 1365, 1372 (9th Cir.1985) (penalty provision in a tariff which provided for charges ten times the normal rate upheld despite carrier's failure to reveal its existence to the shipper); *Louisville & N.R.R. v. Mead Johnson & Co.*, 737 F.2d 683 (7th Cir.1984) (misquotation of rate held not a bar to later recovery of correct rate); *Fry Trucking Co. v. Shenandoah Quarry, Inc.*, 628 F.2d 1360, 1363 (D.C.Cir.1980) (carrier awarded difference between agreed upon "contract rates" and published

rates); *Illinois Central Gulf Railroad Company v. Golden Triangle Wholesale Gas Company*, 586 F.2d 588, 592 (5th Cir. 1978) (estoppel defense rejected, storage charges in tariff applied despite repeated assurances by carrier that they would not apply); *Nyad Motor Freight, Inc. v. W.T. Grant Co.*, 486 F.2d 1112, 1114 (2d Cir. 1973) (filed rate applied despite non-filed contract of parties to apply lower rate); *Chicago B. & Q. R. Co. v. Ready Mixed Concrete Co.*, 487 F.2d 1263, 1267 (8th Cir.1973); *Bowser & Campbell v. Knox Glass, Inc.*, 390 F.2d 193, 196 (3d Cir.1968); and *Norfolk & Western R. Co. v. American Comp. St. Corp.*, 181 F.2d 183, 184 (6th Cir.1950).

The "filed rate doctrine" is so absolute that a claim for relief from the filed rate cannot even be predicated on a carrier's alleged fraudulent or intentional misquotation of rates. *Consolidated Freightways Corp. v. Terry Truck, Inc.*, 612 F.2d 465 (9th Cir.), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2990, 64 L.Ed.2d 856 (1980) (counterclaim for fraud dismissed); *Missouri Pacific R. Co. v. Rutledge Oil Co.*, 669 F.2d 557 (8th Cir.1982) (IC Act precludes shippers from asserting estoppel defense of detrimental reliance); *Paulson v. Greyhound Lines, Inc.*, 628 F.Supp. 888 (D.Minn.), *aff'd*, 804 F.2d 506 (8th Cir.1986) (fraudulent guarantee of next day delivery not grounds for damages as next day service not contained in tariff).

*The ICC's Policy Statement In Ex Parte No. MC-177 Is Without A Basis In Law And Has Been Rejected by Numerous Courts*

In the face of eighty years of contrary judicial precedent, Defendants request this Court to rely upon *Ex Parte* No. MC-177. *National Industrial Transportation League—Petition to Initiate Rulemaking on Negotiated Motor Common Carrier Rates*, 3 I.C.C. 2d 99 (1986), in an effort to establish equitable defenses to the requirements of 49 U.S.C. Section 10761(a). At the outset, it should be noted that this is a *non-binding policy statement* which is contrary to years of unwavering judicial statutory construction. The policy state-

ment is inconsistent with the statutory mandate of 49 U.S.C. 10761(a) and is without a reasonable basis in law. Thus, the policy statement is not entitled to deference by this Court. Cf. *SEC v. Sloan*, 436 U.S. 103, 118–19, 98 S.Ct. 1702, 1711–12, 56 L.Ed.2d 148 (1978); *FMC v. Seatrain Lines, Inc.*, 411 U.S. 726, 745, 93 S.Ct. 1773, 1784, 36 L.Ed.2d 620 (1973); and *West Coast Truck Lines, Inc. v. Kaiser Aluminum & Chemical Co.*, supra.

In *Delta Traffic Service, Inc. and Oneida Motor Freight, Inc. v. Georgia–Pacific Corporation*, 684 F.Supp. 769, 1988 Fed. Carr.Cas. (CCH) para. 83,349 (D.Conn. 1987), Chief Judge Daly provided an excellent summation of the development and state of the law in this area. Therein, Chief Judge Daly concluded that Equitable defenses such as that here proffered by Defendants are "statutorily barred". *Id.*, at p. 58,018. The Court found that adherence to the "filed rate doctrine" has been consistently required regardless of the defense sought to be interposed. Further, Chief Judge Daly noted that when Congress rewrote the statutes governing interstate motor carriers it neither explicitly nor implicitly amended the law requiring strict adherence to the filed rate doctrine. The Court also noted that while the ICC is "free to change its policies, [it] is not free to change a clearly established rule of law." *Id.*, at p. 58,020.

In *Cooper v. California Consolidated Enterprises, Inc. (In re: Carolina Motor Express, Inc.)*, 78 B.R. 773 (Bkrtcy.W. D.NC 1987), this Court stated that *Ex Parte* No. MC–177:

> ... constitutes, at most, an invitation for courts to refer unreasonable practice cases for analysis. The Commission readily admits that consistent with the statutory scheme, the Court retains its authority to set the remedy and accept or reject the Commission's conclusions. *Ex Parte* No. MC–177, p. 8.

Op., p. 774. See also, *West Coast v. Kaiser*, supra 1988 Fed.Carr.Cas. (CCH) at 58,488; *Taynton Freight System, Inc. v. Tripar Transportation (In re: Taynton Freight System, Inc.)*, 1988 Fed.Carr.Cas.

(CCH) para. 83,343 (Bkrtcy.M.D.Pa.1987); *Oneida Motor Freight, Inc. and Delta Traffic Service, Inc. v. Felsway Corporation (In re: Oneida Motor Freight, Inc.)*, 1988 Fed.Carr.Cas. (CCH) para. 83,346 (Bkrtcy.D.N.J.1987).

In *Tripar Transportation*, supra, Judge Thomas C. Gibbons, in denying a request to refer the freight undercharge issue to the ICC stated:

> ... Additionally, even if we were to refer certain issues to the ICC, the Bankruptcy Court retains its authority to set the remedy and accept or reject the ICC's conclusions. After reviewing the facts presented in this case, it is evident that this case does not involve issues reserved for the special competence of an administrative body, and that the Bankruptcy Court must ultimately be the arbiter of this case. Thus, we find that referral of this case to the ICC would involve an unnecessary delay in the resolution of this adversary proceeding.

*Id.*, at p. 58,004.

The Court goes on to state, "we recognize the longstanding doctrine that equitable defenses are not available to shippers faced with uncharged collection actions brought by common carriers". (Citation omitted). *Id.* at p. 58,004, n. 3.

Elevating a shipper's reliance on a quoted rate to a cognizable defense sharply departs from the law enacted by the legislature and consistently enforced by the judiciary. As noted by Judge Patel in *West Coast v. Kaiser*, supra, at p. 58,488:

> ... efforts to refer matters to the ICC must be reviewed in light of the fact that the ICC does not have the power to reject effective tariffs, *ICC v. American Trucking Ass'ns*, 467 U.S. 354, 363 [104 S.Ct. 2458, 2463, 81 L.Ed.2d 282] (1984), reh'g denied, 468 U.S. 1224 (1984), nor the authority to order the waiver of undercharges, *NITL—Petition to Institute Rulemaking*, 1986 Fed.Car.Cas. (CCH) para. 37,284, at 47,352.

■ When the alleged unreasonable practice involves a violation of a filed rate (not the reasonableness of the rate itself) the courts and not the ICC have exclusive

jurisdiction to determine and apply the proper charge. *I.C.C. v. J.B. Montgomery, Inc.*, 483 F.Supp. 279 (D.Colo.1980); *Farley v. Santa Fe* 778 F.2d at 1370-71.

In *J.B. Montgomery*, the ICC, on behalf of various shippers, sought restitution for past duplicate billings, or overcharges, in addition to prospective injunctive relief. The defendant argued that the cases should have been remanded to the ICC for agency proceedings on whether the defendant's practices were unreasonable and/or discriminatory. The court rejected the defendant's attempt to refer the case to the ICC stating:

In this case, the primary issue is not the reasonableness of the rates as filed with the ICC, but whether the defendants have been operating in violation of those rates. While the former question clearly does involve the expertise of the ICC, the latter does not.

483 F.Supp. at 281.

In *Farley*, the plaintiffs argued that Santa Fe's motion for summary judgment on the issue of the filed rate doctrine should have been stayed pending referral of the matter to the ICC contending that the tariff which required Farley to pay a penalty of ten times the normal rate for failure to comply with an audit was unreasonable as applied to the facts of its case. Farley did not argue that the tariff provision was unreasonable on its face or that its language was not used in the ordinary sense. Rather, Farley sought referral based on the practice of applying the tariff in its particular case. The Ninth Circuit Court of Appeals rejected this argument finding that referral is not proper where the referring party admits the tariff is unambiguous and reasonable on its face. 778 F.2d at 1371.

■ In this proceeding the Defendants present no evidence that the involved tariffs are in anyway confusing or "unreasonable on their face". Rather, each Defendant admits that the Debtor was required to charge pursuant to its "filed rates" and complains only that negotiated rates were not confirmed by a tariff filing. Since there is no dispute as to what are the correct rates, this Court is fully capable of reviewing the application of the involved rates and deciding the amount owed by each Defendant.

In *Civil Aeronautics Board v. Modern Air Transport*, 179 F.2d 622 at 624 (2d Cir.1950), the court held that the doctrine of primary jurisdiction:

... is not applicable where the issue, regardless of its complexity, is not the reasonableness of the rate or rule, but a violation of such rate or rule. Thus, it has been continuously asserted that the courts have original jurisdiction to *interpret tariffs, rules* and *practices* where the issue is one of violation, rather than reasonableness. (Emphasis supplied).

The case law is clear that when it comes to the practice of violating a published tariff rate, referral of the issue to the ICC is improper and any decision rendered by the ICC therefrom is considered a nonbinding advisory opinion. *Williams v. AT & T Technologies, Inc. (In re: Silverwheel Freightlines, Inc.)*, Adversary Proceeding No. 85–0743–S (Bkrtcy.D.Or. Sept. 11, 1986) [published as adopted, 86 B.R. 232 (D.Or. 1986)]; *Delta Traffic Service, Inc. and Oneida Motor Freight, Inc. v. Pride Health Care Equipment*, Civil No. 87–0915 (M.D. PA. Nov. 18, 1987), 1988 Fed.Carr.Cas. (CCH) para. 83,345 (1987).

As stipulated, both Defendants were aware of the obligation to pay the Debtor its filed tariff and without further thought acted as if there was no such obligation. Certainly, if the Defendants genuinely desired to deal with the Debtor as a contract carrier, they should have been willing to sign written bilateral contracts with the Debtor. Alternatively, the Defendants could have verified the rates they desired to pay by requiring the Debtor provide a copy of its tariff to them prior to their tendering freight to the Debtor.

The Court in *West Coast* was faced with a similar argument raised by a shipper who had "negotiated" a rate with a motor carrier and was now seeking relief from the undercharge suit brought by the carrier. In response, Judge Patel stated:

Here there is no evidence the shipper has sought relief directly from the ICC nor did it institute its own action. Referral at this stage would encourage the shipper who has received the advantage of a lower rate to wait and see whether the carrier will attempt to recover the undercharge and only then assert his unreasonable practice claim. This flies in the face of the statute and its clear purpose.

*Id.*, at p. 58,488–89.

*Recent Court Decisions Affirm That The Motor Carrier Act of 1980 Did Not Change The Strict Requirements Of the Filed Rate Doctrine*

Although the ICC in *Ex Parte* No. MC–177 looks to the Motor Carrier Act of 1980 (P.L. 96–296, July 1, 1980) to justify "equitable" defenses, the 1980 Act did not change the strict requirements of 49 U.S.C. Section 10761(a). This was recently made clear by the Supreme Court in *Square D Co. v. Niagara Frontier Tariff Bureau,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986).

In *Square D,* the Supreme Court revisited the filed rate doctrine in an anti-trust context and concluded that the 1980 Motor Carrier Act did not alter the statutory requirements and consequences. In that case, the Court quoted with approval from *Koegh v. Chicago & Northwestern R. Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), thus:

> The legal rights of shipper as against carrier in respect to a rate are measured by the published tariff. Unless and until suspended or set aside, this rate is made, for all purposes, the legal rate, as between carriers and shipper. The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier.

*Square D v. Niagara,* 476 U.S. 416–17, 106 S.Ct. at 1927.

■ The ICC's policy statement attempts to distinguish *Square D* on the grounds that it merely holds that carriers must *file* rates and not that the ICC is precluded from declaring unreasonable the *collection* of the filed rate. *Ex Parte* No. MC–177, 3 I.C.C.2d at 108. Such a conclusion is in direct opposition to that reached by the 8th Circuit in *Paulson v. Greyhound Lines, supra,* where the 8th Circuit affirmed a district court decision that special agreements of the parties cannot, as a matter of law, alter the requirements of a published tariff. Significantly, the court in *Paulson* relied specifically on *Square D* in upholding the vitality of the filed rate doctrine. Additionally, the semantics used by the ICC are not persuasive. *Square D* states that the filed rate is the governing rate. Unless the rate itself is found unlawful, it must be collected. The requirements of Section 10761 are meaningless if the filed rate need not be collected. The filed rate doctrine mandates collection of a lawful tariff rate absent a finding that the rate is itself unlawful, and the ICC has no power to waive the Act's requirements.

In *R.C.C.C. v. U.S.,* 793 F.2d at 379 the D.C. Circuit found the ICC without statutory authority to waive the requirements of 49 U.S.C. Section 10761(a), stating:

> That requirement [for a rate to be contained in a tariff] is utterly essential to the Act. Without it, for example, it would be monumentally difficult to enforce the requirement that rates be reasonable and nondiscriminatory, *see* 49 U.S.C. Sections 10701 and 10741(b) and virtually impossible for the public to assert its right to challenge the lawfulness of existing or proposed rates, *see* 49 U.S. C. Sections 10708(a)(1) & 11701(a).

In *Motor Carrier Audit & Collection Co. v. United Food Service, Inc.,* 1987 Fed. Carr.Cas. (CCH) para. 83,326 (D.Colo.1987), the Court after a thorough recitation of the filed rate doctrine and an in-depth analysis of the Commission's decision in *Ex Parte* No. MC–177 concluded:

> As the ICC itself admits, 'the commission does not have jurisdiction over claims challenging the reasonableness of motor carrier rates charged in the past nor authority to order the waiver of undercharges.' *Id.* at 4. Rather, it can only provide the courts with an advisory opinion as to whether a shipper should be allowed to assert equitable defenses to a carrier's claim. *While the ICC may so*

*advise a court, it is difficult to understand how, in the light of clear precedent establishing that equitable defenses are not generally available, a court could adopt the ICC's recommendation that a defendant be allowed to assert those defenses.* (Emphasis supplied).

*Id.,* at p. 58,434.

The Court in *Motor Carrier Audit* readily distinguished *Seaboard System R.R. v. U.S.,* 794 F.2d 635 (11th Cir.1986) the case most heavily relied upon by the ICC in Ex Parte MC–177, as dealing with a confusing tariff and limited to those cases where the ICC had original jurisdiction over the case (i.e., where an administrative complaint was filed with the ICC). Moreover, the *Seaboard System* case was a railroad case wherein the ICC has jurisdiction to award monetary reparations. In motor carrier cases, however, the ICC does not have jurisdiction to order the waiver of undercharges or award reparations. See 49 U.S.C. 11706(c)(2).

There have been numerous other recent U.S. District Court decisions denying defendants' motions to refer their cases to the ICC because the ICC is not capable of rendering a legally binding decision allowing the waiver of undercharges. See *Feldspar Trucking Company, Inc. v. Greater Atlanta Shippers, Inc.,* 683 F.Supp. 1375, 1988 Fed.Carr.Cas. (CCH) para. 83,350 (N.D.Ga.1987); *Delta Traffic Service, Inc. and Oneida Motor Freight, Inc. v. Cuisinarts, Inc.,* C.A. No. H–87–424 (AHN) (D.Conn. Oct. 28, 1987); *Delta Traffic Service, Inc. and Oneida Motor Freight, Inc. v. Personality Plastics, Inc.,* C.A. No. CV–87–2323 (E.D.N.Y. Oct. 7, 1987); *Delta Traffic Service, Inc. and Oneida Motor Freight, Inc. v. Keystone Lighting Corporation,* C.A. No. 87–3659 (E.D.Pa. Sept. 24, 1987); and *Delta Traffic Service, Inc. and Oneida Motor Freight, Inc. v. Occidental Chemical Corporation,* C.A. No. 87–4217 (E.D.Pa. August 18, 1987).

Other Courts have also determined that referral to the ICC in cases raising similar "equitable" defenses to freight under-charge actions would be inappropriate and recognized that the filed rate doctrine cannot be overruled by the ICC. *Motor Carrier Audit and Collection Co. v. Medline Industries, Inc.,* Case No. 87–C–6123 (N.D. Ill. Nov. 2, 1987) (declaring *Ex Parte* No. MC–177 to be inconsistent with the statute and precedents that bind the Court, and that any equitable defense that the ICC might recognize cannot take precedence over the filed rate); and *Motor Carrier Audit and Collection Co. v. Casio,* Case No. 87–C–6124 (N.D.Ill. Oct. 27, 1987).

Finally, the Court in *Robert Yaquinto, Jr., Trustee, for Caravan Refrigerated Cargo, Inc. v. Supreme Beef Processors, Inc.,* C.A. 3–87–2274–R (N.D.Tx. Jan. 20, 1988), in entering summary judgment in favor of the Trustee against a shipper's claim for equitable relief stated:

First, MC–177 is merely an advisory opinion and as such provides no precedential value. *Pacific Gas & Electric Co. v. F.P.C.,* 506 F.2d 33 (D.C.Cir.1974). Second, and more fundamentally, an administrative agency cannot overrule the statutory requirements to publish and charge rates as set forth in tariffs. Congress was fully cognizant of the well established interpretation of Section 10761 when it enacted the Motor Carrier Act of 1980, and yet Congress choose not to amend that section.

*Id.,* slip op. at 6.

The Court concluded that:

Defendant is charged with notice of the properly filed tariffs. Consequently, its arguments of ignorance is unavailing. For this Court to excuse Defendant from compliance with Section 10761 it would be emasculating that section's ability to prevent discriminatory allowances by carriers.

*Id.*

## CONCLUSION

Courts at the trial level should be very slow to change policy within the framework set out by Congress, and as delineated by the Supreme Court. This is particularly true where such changes could have

been easily affected by an Act of Congress in 1980 when Congress was amending the motor carrier portion of the Interstate Commerce Act. However, Congress refused to alter the strict tariff requirements of the Act. Thus, the Court must, without regard to what its opinion is as to what the law should be, rule with regard to what the law is. And that is, that the "filed rate" doctrine is still the law of the land, and that, without regard to the ingeniousness of the defenses, the Court cannot allow them as they are not allowed by law.

Therefore, the Court finds that the defense of contract carriage is non-existent and reliance by the Defendants on the negotiated rate was not reasonable, and even if it had been found to be reasonable that the "filed rate" doctrine is still the law of the land and that the Plaintiffs should recover judgment in accordance with their actions on matters of the undercharges in the amount of $58,793.03 owed by CCE, and $13,795.73 owed by Reiter.

As to the Defendant that owes accounts receivable not relating to undercharges, the Court finds in the case of CCE that $4,804.55 is owed and renders judgment on that amount.

As to the subject of attorney's fees and interest, the Court will not approve any attorney's fees or interest on any of the undercharge cases, as the conduct of the parties in this case is such that each should bear its own costs. Interest of course as to the undercharges shall bear the statutory rate of interest from date of the judgment until paid, but not any interest prior thereto. As to the accounts receivable of $4,804.55 with regard to CCE, the Court finds that the tariff provisions with regard to interest and attorney's fees should apply and it is so ordered.

An appropriate judgment reflecting all the above shall be entered.