In re UNITED SHIPPING
COMPANY, Debtor.

GLOBAL TRANSPORTATION
SERVICES, INC.,
Plaintiff,

v.

UNITED SHIPPING COMPANY,
Defendant.

Bankruptcy No. 4–88–533.
Adv. No. 4–89–468.

United States Bankruptcy Court,
D. Minnesota.

Nov. 12, 1991.

John R. Stoebner, Steven Weiss, Lapp, Laurie, Libra, Abramson & Thomson, Minneapolis, Minn., for plaintiff.

Thomas E. Wolff, Minneapolis, Minn., for defendant.

## MEMORANDUM ORDER WITHDRAWING REFERRAL TO THE INTERSTATE COMMERCE COMMISSION, DENYING MOTION TO DISMISS AND GRANTING MOTION FOR SUMMARY JUDGMENT

NANCY C. DREHER, Bankruptcy Judge.

The above-entitled matter came on for hearing before the undersigned on the 17th day of September, 1991, on the plaintiff's motion for lift of stay and for entry of summary judgment, and on the defendant's motion for withdrawal of referral to the Interstate Commerce Commission and for dismissal. Appearances were as follows: John Stoebner and Steven Weiss on behalf of the plaintiff, and Thomas Wolff on behalf of the defendant.

### UNDISPUTED FACTS

The plaintiff, Global Transportation, Inc. ("Global"), is a Washington corporation registered to do business in Minnesota. Defendant, United Shipping Company ("United"), was at all relevant times hereto a Minnesota corporation with its principal

place of business in Minnesota. United operated as both a motor common carrier and a motor contract carrier pursuant to authority issued by the Interstate Commerce Commission ("ICC").

In late 1986 and early 1987, United solicited Global for the purpose of carrying Global's commercial traffic moving from the State of Washington to various points throughout the midwest, southeast and eastern United States. On January 4, 1987, after discussing various services, rates and destinations, representatives of Global and United signed a written document entitled "Transportation Contract." The Transportation Contract read as follows:

> THIS AGREEMENT, made and entered into this 4th day of January, 1987, by and between UNITED SHIPPING COMPANY, Roseville MN, hereinafter designated the "carrier" and Global Transportation Services; Seattle WA, hereinafter designated as the "shipper" [sic].
>
> WHEREAS, the carrier has been granted authority to operate in interstate commerce as a contract carrier, in MC 153829, Sub No. 3;
>
> WHEREAS, the shipper desires to enter into a contract with the carrier for the transportation of certain commodities;
>
> NOW THEREFORE, it is hereby understood by and between the parties:
>
> 1. The shipper will pay the carrier compensation for such transportation in accordance with the carrier's schedule of rates and charges.
>
> 2. The carrier will furnish and maintain in force such insurance as is required by the Interstate Commerce Commission.
>
> 3. The shipper will agree to furnish carrier a minimum of one shipments [sic] of freight per year.
>
> 4. The contract shall continue in full force and effect as long as the existing authority is in effect, and shall be automatically extended from year to year, unless written notice of termination is given by either party to the other at least ninety (90) days before expiration of the primary term or each extended term thereafter.

Two days later, on January 6, 1987, United's representative sent a letter to Global's representative stating, "This letter will serve as written confirmation of the rates we discussed on the telephone this morning. United Shipping Company will handle your shipments from Seattle WA at the following rates." The letter then listed a schedule of rates for carriage to various destinations. On June 18, 1987, United notified Global that it was reducing its rates for several of the destinations listed in the January 6 letter, and sent Global a new rate schedule. On two subsequent occasions, representatives of the two companies discussed rates for cities which were not listed in the January 6 letter, and these discussions were confirmed in writing.

During 1987, Global tendered numerous shipments to United. United made delivery of all shipments and issued freight bills to Global based on the scheduled rates. Global paid all such freight bills in full.

United filed a petition under chapter 11 of the Bankruptcy Code on February 28, 1988. United has now asserted a right to recover an additional $12,241 from Global for the services performed. The basis of United's claim is that when it performed services for Global, it did so under its common carrier authority, rather than its contract carrier authority, and therefore the proper rates for carriage were its common carrier tariffs filed with the Interstate Commerce Commission rather than the rates listed in the schedules sent to Global. The $12,241 figure therefore represents the difference between the amount United asserts is due for the carriage based on the tariffs and the amount it received based on the rate schedules.

## PROCEDURAL HISTORY

Global filed this adversary proceeding on November 16, 1989, praying for a declaratory judgment that the rates listed in the schedules it received were the proper rates or in the alternative that United's practice of negotiating a rate and then demanding

payment of the higher tariff is an unreasonable practice. United subsequently filed its own lawsuit to recover the $12,241 in the King County Superior Court in Washington state (Case No. 90–2–011607) which was removed to the United States District Court for the Western District of Washington (Case No. C90–216D) on February 9, 1990. The Washington District Court entered an order dated June 8, 1990, staying the proceedings before it, pending the Supreme Court's decision in *Maislin Industries, U.S., Inc., v. Primary Steel, Inc.,* —— U.S. ——, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990).

On April 5, 1990, I referred the issues in this declaratory judgment action to the Interstate Commerce Commission and stayed the present proceedings. Rather than proceed immediately before the ICC, Global and United agreed to defer filing the ICC petition until after the *Maislin* case was decided, since the resolution of *Maislin* could well have dispensed with the "unreasonable practice" issue in the present case.

*Maislin* was decided in June of 1990, and later that month, Global underwent a change of counsel. Global's new counsel contacted counsel for United and discussed settlement in October and November of 1990, but no agreement could be reached. Counsel for Global continued to defer filing the ICC petition through the end of 1990 due to decisions on identical issues that were being rendered against United and another carrier by the Fourth Judicial District Court for the State of Minnesota (Case Nos. 90–16136, 90–10274). On February 28, 1991, the ICC published an Advance Notice of Proposed Rulemaking ("Ex Parte No. MC–198") in which it proposed to revise or repeal its contract carrier regulations at 49 C.F.R. 1053, and wherein it stated, "[t]he Commission has no intention of engaging in a wholesale examination of the contracts of contract carriers, either within or outside of the context of undercharge claims." In light of this statement,

counsel for Global again chose to defer filing the ICC petition pending resolution of Ex Parte No. MC–198. On August 27, 1991, after public comment on the Advance Notice of Proposed Rulemaking, the ICC proposed to entirely revoke the contract carrier regulations at 49 C.F.R. § 1053.

In August of 1991, counsel for United sent a letter to counsel for Global requesting that Global proceed with its case before the ICC. On August 29, 1991, Global filed its present motion to lift the stay of these proceedings and for summary judgment. Global chose to proceed before the Bankruptcy Court rather than the ICC because it felt that *Maislin* had foreclosed its arguments on the "unreasonable practice" issue, and because the ICC stated in Ex Parte No. MC–198 that it had no intention of engaging in a wholesale examination of contracts for carriage.

## POSITIONS OF THE PARTIES

The parties agree that in light of *Maislin* the only issue before me is whether United provided carriage to Global pursuant to its common carrier authority or its contract carrier authority.[1] Global takes the position that the Transportation Contract signed by the parties satisfies the statutory requirements and ICC regulations governing contract carriage. It asserts, therefore, that the proper rate of carriage is the rate agreed to in the schedules sent to Global, and that it is entitled to summary judgment.

United argues that there was no contract that satisfied the statute and regulation, and that therefore carriage was provided under its common carrier authority. That being the case, United asserts that the only lawful rate is the tariff rate filed with the ICC, and that this proceeding should therefore be dismissed because Global has shown no right to relief.

1. Since the issue regarding the reasonableness of United's practice is no longer before me, my earlier decision in *United Shipping Co. v. Duro Paper Bag Manufacturing Co.,* ADV 4–89–177 (March 15, 1991) has no bearing on this decision. In *Duro* the issue before me was the reasonableness of United's undercharge practice, and not whether a contract for carriage existed.

## DISCUSSION

██ Both parties have moved the Court to reopen the case and hear the issue, rather than leave resolution of the matter with the ICC. Global has done so by way of a motion to lift the stay that I ordered on April 5, 1990, while United has moved that I withdraw the referral to the ICC that was contained in the same order. This declaratory judgment action has been pending for two years now, and was stayed over a year and a half ago for the parties to proceed before the ICC. There is still no petition pending before the ICC. A continued referral would only cause further delay and would not be in the interest of judicial economy. *Cf. In re Sharm Express, Inc.,* 127 B.R. 620, 622, 624 n. 4 (D.Minn.1991) (party's failure to pursue its petition before the ICC after referral by court justifies withdrawal of referral). Therefore, to the extent that my April 5, 1990 referral order has any continuing viability, the referral should be withdrawn and the stay of these proceedings should be lifted so that this matter may be resolved expeditiously in the bankruptcy court.[2]

██ United asserts two separate grounds on which Global's complaint should be dismissed. Bankruptcy Rule 7041 incorporates Federal Rule of Civil Procedure 41 which allows a defendant to move for dismissal "[f]or failure of the plaintiff to prosecute or to comply with these rules or any order of court." Fed. R.Bankr.P. 7041. Since Global has failed to file its petition before the ICC even though these proceedings were stayed over a year and a half ago, United asserts that Global has failed to prosecute its case and to comply with my April 5, 1990 referral order. While Global has not diligently prosecuted its case before the ICC, its delay was substantially justified by waiting for resolution of *Maislin* and the Minnesota state court proceedings against United, by the change in counsel, and by the uncertainty created by the ICC's changing policies enunciated in MC–198. In fact it appears that this wait has actually eliminated one of the issues that was originally before me without incurring the costs associated with litigating that issue. Therefore, this case should not be dismissed for Global's failure to prosecute its case before the ICC.

The second reason United asserts that this proceeding should be dismissed is that even though Global has presented all of its evidence, it has established no right to relief because it failed to show that the shipments in question moved under United's contract carrier authority. Since this aspect of United's motion involves resolution of the same issue associated with Global's

---

**2.** Neither party has briefed the issue of whether the doctrine of primary jurisdiction requires that this case proceed before the ICC in the first instance. In its recent Notice of Proposed Rulemaking, Ex Parte No. MC–198, dated August 27, 1991, the ICC noted parenthetically that the determination of whether a shipment moved in contract or common carriage is a matter within its "exclusive jurisdiction." No authority was cited by the ICC and I have found no cases on point. However, several courts have determined the nature of carriage on their own with no referral to the ICC. *See Dan Barclay, Inc. v. Stewart & Stevenson Services, Inc.,* 761 F.Supp. 194, 199–203 (D.Mass.1991); *Atlantis Express, Inc. v. Unicorn Transportation Systems, Inc.,* 764 F.Supp. 135, 138 n. 3 (D.Minn.1991); *Steven Gale v. Norwesco, Inc.,* Civil No. 4–90–156, 1990 WL 284504, D.Minn, Dec. 11, 1990; *In re Carolina Motor Express, Inc.,* 84 B.R. 979, 984–85 (Bankr.W.D.N.C.1988). Furthermore, the ICC's statement appears somewhat inconsistent with two other statements made in MC–198: the August 27, 1991 notice says that state law contract principles should apply to carriage contracts, and the February 20, 1991 notice states that the ICC does not intend to engage in wholesale examination of contracts for carriage. I simply note here that resolution of the issue before me today only requires me to interpret 49 U.S.C. § 10102(15) and 49 C.F.R. 1053.1. There is no indication that the terms of the statute or regulation should be given other than their ordinary meaning, and there are no technical questions of fact requiring agency expertise or an exercise of administrative discretion. *See United States v. Western Pacific R.R.,* 352 U.S. 59, 65–66, 77 S.Ct. 161, 165–66, 1 L.Ed.2d 126 (1956) ("Where the question is simply one of construction, the courts may pass on it as an issue 'solely of law' "); *Burnham v. United States,* 297 F.2d 523, 525 (1st Cir.1961) ("The court required no advice from the administrative agency to conclude that the defendant was a contract carrier within the plain statutory definition"); *In re Sharm Express, Inc.,* 127 B.R. 620, 623 (D.Minn.1991) (primary jurisdiction should only be invoked where the reasons for the existence of the doctrine are present).

summary judgment motion, the two motions will be discussed together.

The facts of the case are undisputed, and the sole legal question before the court is whether there was compliance with the requirements imposed by statute and regulation.[3] If I find that there was no contract for carriage, then United's motion to dismiss should be granted because Global will have failed to establish a right to relief. If however, I conclude that the parties did have a contract for carriage, then Global's motion for summary judgment should be granted because the proper rate was the contract rate as a matter of law.

The statutory definition of a contract carrier appears at 49 U.S.C. § 10102(15) and, in pertinent part, describes a contract carrier as:

> a person providing motor vehicle transportation of property for compensation under continuing agreements with one or more persons—(i) by assigning motor vehicles for a continuing period of time for the exclusive use of each such person; or (ii) designed to meet the distinct needs of each such person.

49 U.S.C. § 10102(15)(B) (Supp.1987). The ICC contract carriage regulations at 49 C.F.R. 1053 require that contracts for carriage be:

> special and individual contracts or agreements which shall be in writing, shall provide for transportation for a particular shipper or shippers, shall be bilateral and impose specific obligations upon both carrier and shipper or shippers, shall cover a series of shipments during a stated period of time in contrast to contracts of carriage governing individual shipments, and copies of which contracts or agreements shall be preserved by the carriers [sic] parties thereto so long as such con-

tracts or agreements are in force and at least one year thereafter.

49 C.F.R. 1053.1 (1991).

The statute first mandates that carriage be pursuant to "continuing agreements," and regulation 1053.1 spells out what must be contained in those agreements in order to comply with the statute.[4] *Dan Barclay, Inc. v. Stewart & Stevenson Services*, 761 F.Supp. 194, 200 (D.Mass.1991), and *In re Carolina Motor Express, Inc.*, 84 B.R. 979, 984 (Bankr.W.D.N.C.1988). Three of the ICC requirements are clearly met here. First, the signed Transportation Contract and subsequent rate schedules are all writings and, unless ambiguous, the parties entire agreement will be determined from those writings. Second, the Transportation Contract dealt with a particular shipper, namely United. Third, the Transportation Contract and rate schedules were all submitted as exhibits, so they clearly have been preserved by the parties as required.

The parties dispute whether the remaining two ICC requirements have been met. The first of these requirements is that the agreement be bilateral and impose specific obligations on both carrier and shipper. The Transportation Contract clearly obligates Global to tender at least one shipment per year to United and also to pay United according to the its rate schedule. The only obligation imposed on United, however, is to "furnish and maintain in force such insurance as is required by the Interstate Commerce Commission." The extent to which this language actually creates any obligation is questionable since United's contract carriage permit itself only grants contract carrier authority "as long as the carrier maintains compliance with the requirements pertaining to insur-

---

**3.** The parties agree that *Maislin* has disposed of the "unreasonable practice" issue and Global no longer asserts a right to relief under that theory.

**4.** As the ICC has made clear in MC–198, it is presently considering repealing the requirements at 49 C.F.R. 1053. However, both parties agree that this change in the ICC's position does not affect the current controversy and that the regulations should be applied as they existed at the time the contract was made and the carriage took place. This approach is consistent with

that taken by other courts considering the question. *See Barclay*, 761 F.Supp. at 201; *Atlantis*, 764 F.Supp. at 138 n. 3; *but see Zoneskip, Inc. v. United Parcel Service, Inc.*, 1991 WL 89759, 1991 MCC LEXIS 62 (I.C.C. May 28, 1991) (I.C.C. stayed discovery to consider a motion to dismiss, noting that doing so would allow it to determine the effect that the pending rulemaking proceeding in MC–198 would have on the case before it).

ance coverage for the protection of the public (49 CFR 1043)." It thus appears that United had a preexisting duty to maintain proper insurance. However, in its letter dated two days after the Transportation Contract, United committed itself as follows: "United Shipping Company *will handle your shipments from Seattle WA* at the following rates." The "shipments" that United obligated itself to carry are clearly the same shipments which Global promised to tender in the Transportation Contract. In the Transportation Contract, Global made an offer to tender at least one shipment for carriage per year to United and United accepted by promising to carry such shipments at its scheduled rates. The parties entered into a contract, and since the consideration for each party's promise is a return promise, the contract is bilateral. The contract was subsequently amended by the later rate reductions and additions to which Global consented, but these amendments do not invalidate the contract because the bilateral obligations continued in force.

I am aware that other courts have held that rate quotations and letters do not constitute contracts under regulation 1053.1, but the facts in those cases are distinguishable. In *Dan Barclay, Inc. v. Stewart & Stevenson Services*, 761 F.Supp. 194 (D.Mass.1991), and *In re Carolina Motor Express, Inc.*, 84 B.R. 979 (Bankr. W.D.N.C.1988), the courts held that rate quotations and letters from one party to the other were not written contracts because they simply constituted offers to deal which imposed no obligation upon the shipper. *Barclay*, 761 F.Supp. at 202; *Carolina*, 84 B.R. at 984. Such offers are accepted when the shipper tenders goods for delivery and thus give rise to *unilateral* contracts which do not satisfy regulation 1053.1. This is a very different situation than the present case where United delivered the rate schedules in response to a written promise of delivery by Global and where the schedules also contained a reciprocal promise of carriage. There was a written contract for hire in the present case which was lacking in both *Barclay* and *Carolina*.[5]

■ The second disputed requirement under regulation 1053.1 is the requirement that the contract "cover a series of shipments during a stated period of time in contrast to contracts of carriage governing individual shipments." 49 C.F.R. 1053.1 (1991). The District Court for the District of Minnesota has recently held that "[t]he absence of specific terms in the transportation agreement indicating that it covers a series of shipments over a stated period of time is fatal to [the existence of contract carriage]." *Gale v. Norwesco, Inc.*, Civil No. 4–90–156, 1990 WL 284504 (D.Minn. Dec. 11, 1990). However, Judge Doty's decision in *Gale* relied on the ICC's position as stated in *Diversey Wyandotte Corp.— Petition for Declaratory Order—Certain Rates and Practices of Campbell 66 Express, Inc.*, 1990 Fed.Car. Cases ¶ 37,821 (CCH) (I.C.C. June 4, 1990) and *MCI Telecommunications Corp. v. E.L. Murphy Trucking Co.*, 1989 Fed.Car. Cases ¶ 37,748 (CCH) (I.C.C. June 22, 1989), but the ICC has now largely disavowed that position. *See* footnote 7, *infra*. Furthermore, even if the requirement in *Gale* must still be met, the Transportation Contract in the present case stated that it "shall continue in full force and effect as long as the existing authority is in effect, and shall be automatically extended from year to year, unless written notice of termination is given by either party to the other at least ninety (90) days before expiration of the primary term." Thus, the period of the contract was stated therein: one year, extendable from year to year for as long as United's permit was valid.[6] Further, the

5. The existence of the written contract also distinguishes this case from *Atlantis Express, Inc. v. Unicorn Transportation Systems, Inc.*, 764 F.Supp. 135 (D.Minn.1991), wherein the court found no valid contract for carriage because there was a mere *oral* agreement. *Atlantis*, 764 F.Supp. at 138 n. 3.

6. The conclusion that such language constitutes a "stated period of time" is supported by a 1937 ICC decision wherein the ICC said that "an agreement to transport property extending for a week, with further provision that it will continue from week to week until terminated, is an agreement for continuous transportation." *Ed-*

contract was for carriage of "a minimum of one shipment[ ] of freight per year" for the life of the contract. It is argued by United that this contract does not cover a "series of shipments" because Global could have tendered one shipment to United and then terminated the contract, thus limiting the contract to a single shipment. However, the regulation itself implies that the reason for the "series of shipments" requirement is to distinguish contracts governing individual shipments. The language of the Transportation Contract is much more consistent with a contract contemplating a series of shipments over the life of the contract rather than a single shipment, and in fact a series of shipments were delivered under the contract. Therefore, this aspect of the regulation was also met.

■ The ICC's decisions in *Diversey* and *MCI* seem to suggest that there are other necessary aspects of contracts for carriage including: destination of shipments, specific equipment to be provided, volume of freight involved, and transportation rates. First, I note that an absolute *requirement* that the contract list specific equipment to be provided appears to directly conflict with 49 U.S.C. § 10102(15) which mandates *either* that specific equipment be designated for the shippers exclusive use, or that the contract meet the shippers distinct needs. Second, in MC–198 the ICC itself has stated that the contract provisions it listed in *Diversey* and *MCI* are not absolute requirements.[7] Since the contract in the present case actually does meet most of these "requirements," and in light of the ICC's apparent position that the requirements are not absolute, *Diversey* and *MCI* do not impede a finding that this agreement satisfies the statute.

■ Since regulation 1053.1 has been satisfied, this contract constitutes a "continuing agreement" as required by 49 U.S.C. § 10102(15)(B). Section 10102(15)(B)

then requires that the agreement either assign specific vehicles for the exclusive use of the shipper or meet the distinct needs of the shipper. Nothing in the record suggests that specific vehicles were assigned for Global's exclusive use, so this contract must have been designed to meet Global's distinct needs in order for this to be considered contract carriage.

■ A distinct need is defined as a need for more specialized services than a common carrier can provide. *Barclay,* 761 F.Supp. at 200 (citing *Global Van Lines, Inc. v. I.C.C.,* 804 F.2d 1293, 1301 (D.C.Cir. 1986)). In *Barclay,* the court observed that the distinct needs differentiation between a common and contract carrier "becomes hazy" where the carrier has authority to perform both types of carriage. Quoting an ICC opinion, the court found that "while both types of carriers would be meeting distinct needs, 'common carriers do not do so on a committed basis and over a continuing period of time.' " *Id.* (quoting *Interstate Van Lines, Inc., Extension— Household Goods,* 5 I.C.C.2d 168 (December 6, 1988)).

In the present case, United obligated itself to carry all shipments tendered by Global, regardless of the number. Whether Global needed to make several hundred shipments or only one, United agreed to carry those shipments and this met a distinct need that is not met by a common carrier which only handles individual shipments. Furthermore, this was a year to year contract, so the need was met on a continuing basis. Therefore, the contract for carriage in the present case met Global's distinct needs.

### CONCLUSION

■ Global and United had a "continuing agreement" which was designed to meet Global's "distinct needs," and thus formed

---

*ward Webb, Jr., Contract Carrier Application,* No. MC–50847, 1937 Fed.Car. Cases 17,037 (CCH) (I.C.C. January 19, 1937).

**7.** The ICC said of *Diversey* and *MCI,* "The words 'such as' show that the Commission intended to offer examples of the types of terms one might

expect to find in a contract for contract carriage.... [T]he Commission's regulations do not require that any of the cited terms be included in a contract." *Ex Parte No. MC–198,* 1991 WL 62174, 1991 MCC LEXIS 16 (I.C.C. Feb. 20, 1991) (emphasis added).

a valid contract for carriage under 49 U.S.C. § 10102(15). Therefore, the proper rates for carriage were the agreed upon rates listed in the schedules United sent to Global and in the subsequent modifications and additions thereto.

ACCORDINGLY, IT IS HEREBY ORDERED:

1. United's motion to withdraw the April 5, 1990 referral to the ICC is GRANTED;

2. Global's motion to lift the April 5, 1990 stay of this proceeding is GRANTED;

3. United's motion to dismiss this proceeding is DENIED; and

4. Global's motion for summary judgment is GRANTED, and Global shall have judgment against United declaring that the subject shipments moved under a valid contract for carriage, that the rates quoted by United in its letters to Global are the only applicable rates for such shipments, and that Global therefore is not liable to United for any undercharges on account of such shipments.

LET JUDGMENT BE ENTERED ACCORDINGLY.