**DAN BARCLAY, INC., Plaintiff,**

v.

**STEWART & STEVENSON SERVICES, INC., Defendant.**

**Civ. A. No. 89–2590–C.**

United States District Court,
D. Massachusetts.

April 1, 1991.

Robert G. Parks, Wellesley Hills, Mass., for plaintiff.

Wesley S. Chused, Kroll & Tract, Boston, Mass. and David H. Coburn, Steptoe & Johnson, Washington, D.C., for defendant.

MEMORANDUM

CAFFREY, Senior District Judge.

### I.

The current action arises out of a dispute between a motor carrier, Dan Barclay, Inc. ("Barclay"), and a shipper, Stewart and Stevenson Services, Inc. ("Stewart"). Jurisdiction is founded upon diversity of citizenship, and the amount in controversy exceeds $50,000. The case is currently before this Court on Barclay's motion for summary judgment, and Stewart's cross-motion for partial summary judgment or, in the alternative, for referral to the Interstate Commerce Commission ("ICC"). Upon consideration, Barclay's motion for summary judgment should be denied in its entirety, and Stewart's cross-motion for partial summary judgment should be allowed.

### II.

The following facts are undisputed. The defendant, Stewart, is a manufacturer of equipment used in power generation. In July, 1987, acting through a Texas transportation broker, Stewart contacted Woko Transportation Services ("Woko"), a Maine transportation broker. A transportation broker acts on behalf of shippers to arrange shipping services and to provide other services involved in the movement of cargo with unusual dimensions. Stewart hired Woko to arrange the shipment of various pieces of large equipment from a marine terminal in Portland, Maine, to Lowell, Massachusetts, where they were to be used in a power plant then under construction. The President of Woko, William J. Orcutt, contacted Barclay on September 18,

1987. Barclay is an interstate for-hire motor carrier authorized by the ICC to conduct business as both a common carrier and a contract carrier. Barclay was known to specialize in the area of transporting oversized and overweight cargo. Orcutt informed Barclay about the shipments, and, according to his affidavit, advised Barclay that the cargo could not exceed eighteen feet or it would violate various permits that he had requested from the state highway authorities.

Later that same day, Barclay telephoned Orcutt specifying rates for the desired shipments. Barclay confirmed these rates in a writing dated September 24, 1987. The letter read as follows:

"Dear Bill:

This is written to confirm our rate quotation for the transportation of a co-generation plant from Portland, Me., to Lowell, Ma.

Based on the information which you provided us, we agree to transport the following six (6) pieces at a lump sum price of $38,290.29. At your request, a breakdown would be as follows:

| | | | | |
|---|---|---|---|---|
| 1 Main Unit weighing $25,875.00 | 135,000 lbs. | 67'6"L × | 14'0"W × | 14'7"H |
| 1 Generator " $3,135.60 | 124,000 lbs. | 21'4"L × | 11'6"W × | 10'9"H |
| 1 Roof module " $2,463.89 | 37,000 lbs. | 32'5"L × | 14'0"W × | 12'7"H |
| 1 Air cleaner " $2,179.92 | 18,500 lbs. | 13'11"L × | 10'0"W × | 14'1"H |
| 1 Air cleaner " $2,179.92 | 18,500 lbs. | 13'11"L × | 10'0"W × | 14'1"H |
| 1 Control house " $2,455.94 | 37,000 lbs. | 34'0"L × | 13'0"W × | 12'10"H |

This price reflects our provision of the transporting equipment, drivers and the base transportation of the above pieces. As agreed, this quote does not include the cost of any additional services such as bridge studies, route surveys, state fees, utility charges, escorts and costs not specifically outlined.

It is understood that loading is to be performed by the shipper and unloading by the consignee. Two hours free time shall be allowed whereas detention time will be billed at $104.30 per hour for time incurred beyond the free time at both the origin and destination.

As you have requested us to perform this assignment within the next two weeks, we are awaiting your confirmation and additional information as to routing, escorts and actual dates.

We greatly appreciate this service opportunity and look forward to hearing from you soon. Thank you."

---

Pursuant to a telephone call on September 28, the parties agreed that Barclay would transport two of the six items, the main unit and the generator.

Barclay's crew arrived in Portland, Maine, on October ninth or tenth.[1] According to Orcutt's deposition testimony, the crew and equipment included two drivers, one mechanic, one foreman, two trucks, two trailers and one station wagon. From this point on, the transportation of the equipment experienced several delays; each party blames the delay on the other's ineptness. Stewart states that due to the crew's unfamiliarity with the equipment, it took most of the day of October 10 to load the main unit and the generator onto the trailers. Barclay states that when difficulty with turning corners was experienced, it was necessary to have a special steering

1. Barclay's complaint states that the vehicles arrived on October 10, whereas Orcutt's affidavit recites that the vehicles arrived on October 9.

mechanism called a bolster fabricated. According to Stewart, the cargo was damaged during this first attempt to drive away from the marine terminal without the bolster.

Leaving aside the issue of fault, it is undisputed that on the following day, Barclay's crew returned to their terminal in New Jersey, leaving the main unit and generator on Barclay's trailers adjacent to the marine terminal in Portland. The crew returned to Portland on October 13 with a steering bolster. On October 15, Stewart contacted Lon Inskeep to provided technical advice regarding the loading of the cargo. Inskeep arrived in Portland on October 15. Although the cargo had been reloaded, it had not yet been moved because its height exceeded permissible limits. After further delay, Barclay demanded payment from Stewart of detention and other charges totalling $38,444 before it would perform any further work. Moreover, in a letter to Orcutt, dated October 22, 1987, Barclay stated that it would charge $1256.55 per day for the "storage/detention" of the trailers. Stewart paid the amount demanded based on an invoice presented by Barclay.

Thus, Barclay's crew returned once again to Portland on November 2, bringing with them a different bolster. At some point prior to moving the cargo, two bills of lading were prepared. The actual movement of the cargo began several days later, the two pieces of equipment departing on different days. There were further delays due, according to Orcutt's affidavit, to weekend and holiday layovers, and poor weather. Both vehicles finally reached the Massachusetts border, where they were required to wait at the same place until November 19 for the appropriate Massachusetts permits to be issued.[2] The cargo finally reached Lowell on the same day, November 19, the transportation having consumed approximately thirteen days. The construction site was not prepared at that point to unload the cargo. Stewart claims that due to the delays outlined above, the construction had entered into a

new phase which made unloading impossible. Therefore, the unloading was delayed until December 3, 1987. Barclay sent Stewart several invoices for detention charges due to the delay. Much later, on June 8, 1989, Barclay claimed that its services had actually been performed under a tariff filed with the ICC, Tariff ICC HSC 401–A. This letter stated that, according to the tariff, Barclay's services were worth $178,204, and that Stewart owed the difference between this amount, and that already paid.

The tariff referred to in the June 8 letter is the subject of much dispute in the present case. Barclay for many years had participated in group tariffs of the Heavy & Specialized Carriers Tariff Bureau. In September, 1987, the bureau informed Barclay that its dues owed to the bureau were in arrears and that if it did not pay, its participation in the tariff would be cancelled. Barclay states that it tendered payment, but that its participation was cancelled nonetheless, on September 24, 1987. Barclay's participation in the tariff was not reinstated until October 19, 1988, well after the completion of the transportation of the cargo in question here.

### III.

Barclay has moved for summary judgment on Count One of its complaint which alleges a cause of action under the Interstate Commerce Act ("Act") for payment of the amount due under the tariff. Barclay also asks that summary judgment be entered in its favor on Stewart's two counterclaims, Count One alleging negligence resulting in damage to the cargo, and Count Two alleging breach of contract arising out of Barclay's alleged overcharge in the amount of $9,433.40. In response, Stewart has moved for partial summary judgment on Count One of Barclay's complaint, or, in the alternative, for referral to the ICC.

■ When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each in-

---

**2.** Orcutt had applied for these permits on September 8, 1987.

stance whether the moving party has met its burden under Rule 56. Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2720 (1983). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). One way of meeting this burden is by showing that there is an absence of evidence to support the non-moving party's case. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553. Once he or she has done so, the opposing party must come forward with enough evidence to demonstrate that there is a genuine issue for trial. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553. It is with this framework that the parties' motions are evaluated.

At the heart of the dispute and at the heart of Barclay's claim under Count One, is the well-entrenched filed rate doctrine. This doctrine arises out of the Act's requirement that common carriers publish and file with the ICC a tariff containing rates, rules and practices which govern their services. *See* 49 U.S.C. § 10762(a)(1) (1990). The Act further provides that a common carrier "may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff." 49 U.S.C. § 10761(a) (1990); *see Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,* —— U.S. ——, 110 S.Ct. 2759, 2762, 111 L.Ed.2d 94 (1990). Violation of this provision can result in the imposition of civil as well as criminal penalties. 49 U.S.C. §§ 11901–17 (1990). This provision of the Act has always been strictly con-

strued. *See Keogh v. Chicago & N.W. Ry.,* 260 U.S. 156, 163, 43 S.Ct. 47, 49, 67 L.Ed. 183 (1922); *Louisville & Nashville R.R. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915). Although the doctrine has come under attack in recent times, it was reaffirmed by the Supreme Court in *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,* where the Court stated:

> "Under the Interstate Commerce Act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent discrimination."

*Maislin Indus., U.S., Inc.,* 110 S.Ct. at 2766 (quoting *Louisville & Nashville R.R. Co.,* 237 U.S. at 97,[3] 35 S.Ct. at 495).

The filed rate doctrine has several purposes and rationales. The broad purpose of section 10762 is to prevent unjust discrimination against smaller shippers, and harmful competition among carriers. *Locust Cartage Co. v. Transamerican Freight Lines, Inc.,* 430 F.2d 334, 343 (1st Cir.), *cert. denied,* 400 U.S. 964, 91 S.Ct. 365, 27 L.Ed.2d 383 (1970); *Delta Traffic Serv. v. Georgia–Pacific Corp.,* 684 F.Supp. 769, 770 (D.Conn.1987). It is thought that by giving the public notice of rates and an opportunity to protest, the filing requirement ensures the stability of the motor carrier industry. *Southern Motor Carriers Rate Conference, Inc. v. United States,* 676 F.2d 1374, 1377 (11th Cir.1982). Part of the rationale, therefore, is that, by virtue of the filed tariff, ship-

---

**3.** In *Maislin,* the Supreme Court rejected the ICC's *Negotiated Rates* policy, which circumvented the filed rate doctrine by holding that a carrier commits an unreasonable practice when

it negotiates a lower rate, and then attempts to collect the filed rate. *Maislin, U.S., Inc.,* 110 S.Ct. at 2768.

pers are charged with constructive notice of the applicable rate. *In re Carolina Motor Express, Inc.,* 84 B.R. 979, 990 (W.D.N.C.1988); *Fry Trucking Co. v. Shenandoah Quarry, Inc.,* 628 F.2d 1360, 1363 (D.C.Cir.1980). Thus, "unless and until suspended or set aside" the filed tariff is the rate that common carriers are required to charge. *Maislin Indus., U.S., Inc.,* 110 S.Ct. at 2765–66 (quoting *Keogh,* 260 U.S. at 163, 43 S.Ct. at 49).

Count One of Barclay's complaint alleging a violation of the Interstate Commerce Act relies on the filed rate doctrine in its claim that Stewart owes $139,760, the amount of unpaid charges under the tariff. Under the Act, there are two types of motor carriers, common carriers and contract carriers. *See* 49 U.S.C. § 10102 (1990). Although in the past, the filing requirements of the Act applied to both types of motor carriers, contract carriers as a class were exempted from the filing requirement by the ICC in 1983 as part of a recent trend toward deregulating the industry and increasing competition. *See Exemption of Motor Contract Carriers From Tariff Requirements,* 133 M.C.C. 150, 1983–1985 Fed.Carr.Cases (CCH) ¶ 37,045 (May 17, 1983). Furthermore, under the current statutory scheme, motor carriers are permitted to operate as both common carriers and as contract carriers. *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,* 110 S.Ct. at 2269. Barclay is, in fact, authorized by the ICC to conduct business as both a common carrier and contract carrier. Barclay argues that it was acting in its capacity as a common carrier when it shipped the equipment for Stewart, and therefore, that the tariff rate should apply. Stewart responds by arguing adamantly that Barclay performed contract carrier services. Furthermore, Stewart claims that even if Barclay acted as a common carrier, its participation in the tariff had lapsed, and therefore, that it is entitled to summary judgment on Count One of Barclay's complaint.

The dispute as to whether Barclay performed common carrier or contract carrier services reflects the tension resulting from the recent so-called "deregulation." Since the enactment of the Motor Carrier Act of 1980, the distinction between the two categories of motor carriage has blurred and their similitude has increased. *Interstate Van Lines, Inc., Extension—Household Goods,* 5 I.C.C.2d 168 (December 6, 1988). As a result, the ICC and courts have been called on with increasing frequency to resolve disputes such as the one at hand, where the carrier attempts to rely on a filed tariff, and the shipper argues that contract carrier service was performed. *See, e.g., In re Carolina Motor Express, Inc.,* 84 B.R. 979 (W.D.N.C.1988); *Diversey Wyandotte Corp.—Petition for Declaratory Order—Certain Rates and Practices of Campbell 66 Express, Inc.,* No. 40342 (June 4, 1990) (1990 WL 288233, LEXIS, Trans library, ICC file) (ICC decision). It is this task that will now be undertaken.

The Act defines a motor common carrier as "a person holding itself out to the general public to provide motor vehicle transportation for compensation over regular or irregular routes, or both." 49 U.S.C. § 10102(14) (1990). In contrast, the Act describes a motor contract carrier as:

a person providing motor vehicle transportation of property for compensation under continuing agreements with one or more persons—(i) by assigning motor vehicles for a continuing period of time for the exclusive use of each such person; or (ii) designed to meet the distinct needs of each such person.

49 U.S.C. § 10102(15)(B) (1990); *PNH Corp. v. Hullquist Corp.,* 843 F.2d 586, 590 (1st Cir.1988). As explained by the ICC, the crux of the distinction is the existence of a unique relationship between contract carriers and their shipper accounts. *Interstate Van Lines, Inc., Extension—Household Goods,* 5 I.C.C.2d 168 (December 6, 1988). Put another way, "[a]n integral element of the relationship between contract carriers and their shippers is the parties' continuing contractual commitment to providing and accepting a specified level of service." *Id.*

There are two components of the statutory definition that must be examined, the requirement of "continuing agreements,"

and the requirement that the agreements meet the "distinct needs" of the shipper. Turning first to the "distinct needs" requirement,[4] a distinct need is defined as a need for more specialized services than a common carrier can provide. *Global Van Lines, Inc. v. Interstate Commerce Comm'n*, 804 F.2d 1293, 1301 (D.C.Cir. 1986) (quoting *Interstate Commerce Comm'n v. J–T Transp. Co.*, 368 U.S. 81, 91, 82 S.Ct. 216, 216, 7 L.Ed.2d 147 (1961)). Services are considered "more specialized" to the extent that they "[differ] in quality, in priority, in control by the shipper, or in some other significant respect, from the service a common carrier holds out to the public at large." *Dixie Midwest Express, Inc., Extension—General Commodities*, 132 M.C.C. 794 (February 3, 1982).[5] The question becomes hazy, however, where, as here, the carrier has authority to perform its services as a common carrier and as a contract carrier. *Interstate Van Lines, Inc., Extension—Household Goods*, 5 I.C. C.2d 168 (December 6, 1988). The ICC has explained, however, that while both types of carriers would be meeting distinct needs, "common carriers do not do so on a committed basis and over a continuing period of time." *Id.*

Applying these principles to the facts at hand, it is unclear whether, as a matter of law, Barclay met Stewart's distinct needs. Stewart makes much of the fact that the cargo transported was large and unusual. It is to be noted, however, that in its common carrier capacity, Barclay hauls large equipment, as evidenced by the fact that it participated in tariffs of the Heavy & Specialized Carrier Tariff Bureau. Stewart, however, points to the construction of the bolster to demonstrate that Barclay provided a specialized service that was other than

that which Barclay held out to the public as a common carrier. Moreover, it appears that Stewart exercised more control over Barclay than would be expected in common carriage, by choosing the routes and by placing time restrictions on the shipments. *See Ensco, Inc. v. Weicker Transfer & Storage Co.*, 689 F.2d 921, 926 (10th Cir. 1982) (shipper's assumption of certain burdens of transportation atypical of common carriage). The issue of who controlled the shipment however, remains in dispute at this point. Moreover, it would be highly relevant to proving contract carriage if Barclay had performed transportation services for Stewart in the past, a fact which is not revealed. *See Ensco, Inc.*, 689 F.2d at 928. Even assuming that the "distinct needs" component of section 10102(15) has been met, however, the relationship between the parties does not meet the second component of the statutory definition.

The second component of the definition of contract carrier requires that there be "continuing agreements." The requirement of continuing agreements in section 10102(15)(B) is defined by regulation. 49 C.F.R. § 1053.1 (1990); *In re Carolina Motor Express, Inc.*, 84 B.R. at 984. Section 1053.1 states in full that:

No contract carrier by motor vehicle, as defined in 49 U.S.C. 10102(15) shall transport property for hire in interstate or foreign commerce except under special and individual contracts or agreements which shall be in writing, shall provide for transportation for a particular shipper or shippers, shall be bilateral and impose specific obligations upon both carrier and shipper or shippers, shall cover a series of shipments during a stated period of time in contrast to contracts of carriage governing individual shipments,

**4.** The definition of contract carriage sets forth two separate means of providing contract carriage, either by assigning motor vehicles for a continuing period of time *or* by meeting the distinct needs of the shipper. 49 U.S.C. § 10102(14) (1990).

**5.** The ICC gave the following illustration in the same decision:
For example, one applicant shows that it has developed a 'custom relocation unit' consist-

ing of a heavy duty pickup truck and a gooseneck trailer designed especially to render prompt service on individual household goods movements. Through the use of this unit, the applicant is better able to provide scheduled pickups and deliveries and expedited service. The provision of specialized equipment clearly is service designed to meet shippers' distinct needs.
*Id.*

and copies of which contracts or agreements shall be preserved by the carriers parties thereto so long as such contracts or agreements are in force and for at least one year thereafter.

49 C.F.R. § 1053.1 (1990). Ironically, the ICC recently announced its intention to consider repealing or amending section 1053. 56 Fed.Reg. 9339 (1991) (announced March 6, 1991). Nonetheless, this Court must apply the regulation as it stands, guided by decisions of the ICC,[6] as well as other courts, that have addressed the statutory distinction between common carriers and contract carriers. It is instructive to discuss several of these in order to make a comparison to the relationship between Barclay and Stewart.

One case relied upon by Barclay is *In re Carolina Motor Express, Inc.*, 84 B.R. 979 (W.D.N.C.1988). In *Cooper*, the trustee in bankruptcy for the debtor carrier brought a claim for undercharges based on the difference between the rate charged, and that contained in a filed tariff. To support its argument that the plaintiff had acted as a contract carrier, the defendant relied on the carrier's oral and written quotations as evidence that they had entered into a contract carrier relationship that met the requirements of the statute and the regulation. The court rejected the defendant shipper's reliance on the quotation letter, holding that "a quotation letter, or other written offer is precluded as not 'bilateral,' and not imposing specific obligations upon the shippers." *Id.* at 984. Moreover, the court emphasized that the letter made no mention that the carrier would handle the shipment as a contract carrier, nor did it contain a promise by the shipper that it would tender any shipments to the carrier. *Id.* at 985. Additionally, the court noted that the letter gave no indication that the carrier would provide the shipper with any special-

ized service or dedication of equipment. *Id.* Thus, the court concluded that the carrier had acted as a common carrier, and that the filed tariff rate applied.

The Interstate Commerce Commission shed light on the distinction between common and contract carriage by way of dicta in *Diversey Wyandotte Corp. Diversey Wyandotte Corp.—Petition for Declaratory Order—Certain Rates and Practices of Campbell 66 Express, Inc.*, No. 40342 (June 4, 1990) (1990 WL 288233, LEXIS, Trans library, ICC file) (ICC decision). In *Diversey*, the carrier sued the shipper for undercharges in the amount of $67,457.97 for services performed from May, 1985, into 1986. The services included sixty-four shipments, although the number of shipments involved in the undercharge claim was unclear. Although the Commission ruled on other grounds, it explained in some detail the distinction between the two types of carriers. The Commission reiterated that by definition, contract carriage requires there to be a written, bilateral contract. *Id.* at 8–9. The decision also enumerated several of the terms that such contracts would be expected to contain, including: destinations of shipments; equipment to be provided, volume of freight involved; rates; and an agreement by the shipper to pay the rates.[7] *Id.* at 8. Furthermore, the Commission noted that the contract must cover a series of shipments during a stated period of time, as opposed to individual shipments. *Id.* at 9. The Commission concluded that a letter which merely confirmed the quoted rates did not meet these criteria, and that the carrier had acted as a common carrier. *Id.*

These decisions can be contrasted with that in *West Coast Truck Lines, Inc. v. Kaiser Aluminum & Chemical Co.*, where

---

6. As a general rule, a court will defer to an agency's interpretation of its own regulation. *Aero Mayflower Transit Co. v. Interstate Commerce Comm'n*, 711 F.2d 224, 227 n. 26 (D.C.Cir. 1983).

7. The actual language in *Diversey* suggests that such terms are mandatory, stating that "a contract must include...." *Id.* In its recent an-

nouncement of its proposal to reconsider 49 C.F.R. § 1053, however, the Commission clarified that the terms outlined in *Diversey* are examples of what might appear in such contracts, and that their inclusion, or lack thereof, is not determinative. *Contracts for Transp. of Property*, 56 Fed.Reg. 9339 (1991) (announced March 6, 1991).

the court held that the service offered had been that of a contract carrier. *West Coast Truck Lines, Inc. v. Kaiser Aluminum & Chem. Co.*, No. C–87–0048 at 4, 1987 WL 46871 (N.D.Cal.1987). In *West Coast Truck Lines*, the carrier made one hundred and thirty freight shipments over the period from January, 1984, to October, 1985. Without indulging in a great deal of analysis, the court held that a transportation agreement, which specified shipping rates and required modifications to be in writing and endorsed by both parties, established that the carrier had acted as a contract carrier.

Several principles can be gleaned from the statute, regulation and decisions regarding the "continuing agreement" prong. First, the "continuing" language of the statute makes it clear that Congress "[relegated] the movement of single shipments to common carriage." *Global Van Lines, Inc.*, 804 F.2d at 1300. As explained in section 1053.1, such contracts are "continuing" in the sense that they "cover a series of shipments during a stated period of time in contrast to contracts of carriage governing individual shipments." Put another way, "continuing" refers to "regularly recurring needs," and repeated transactions, not isolated transactions. *Dean Keyes Towing, Inc.*, No. MC–172724 slip op. (December 21, 1984) (ICC decision); *Fordham Bus Corp. v. United States*, 41 F.Supp. 712, 718 (S.D.N.Y.1941).

■ The agreement at issue here was not continuing, but rather, was an single agreement to deliver two pieces of equipment. The relationship was not a continuing one, but was to terminate at the end of the shipment. The fact that Stewart hired Barclay to move only two of the six items listed in the September 24 letter emphasizes that the relationship was not a continuing one. This is to be contrasted with the cases discussed above, where the relationships involved many shipments over a longer period of time.[8] Stewart points to a

1937 decision of the ICC for the proposition that these continuing contracts "need not cover long periods of time or fixed amounts of traffic." *Contracts of Contract Carriers*, 1 M.C.C. 628, 633 (1937). Stewart therefore argues that the agreement covered "a stated period of time" by virtue of the statement in the letter that the shipping was to be performed "within the next two weeks." *See* 49 C.F.R. 1053.1 (1990). The "two weeks," however, was a time limit, and not an expression of the duration of an ongoing relationship as contemplated by the statute.

A case cited by Stewart actually clarifies this distinction. *See Edward Webb, Jr., Contract Carrier Application*, No. MC 50847, 1937 Fed.Carr.Cases (CCH) ¶ 7037 (January 19, 1937). Stewart relies on this decision for the proposition that contracts lasting only one week meet the statutory criterion of a "continuing" agreement. The decision, however, emphasizes the importance of the "continuing" nature of the relationship, stating: "[n]othing is there said about the period of time over which such contracts or agreements must extend. However, it seems clear that an agreement to transport property extending for a week, with a further provision that it will continue from week to week until terminated, is an agreement for continuous transportation." *Id.*

The second set of principles gleaned from these sources concern the "agreement" aspect of the "continuing agreement" prong of the definition of contract carrier. The September 24 letter relied upon by Stewart as demonstrating contract carriage was not a bilateral contract executed by both parties, but, rather, was merely an offer. *See In re Carolina Motor Express, Inc.*, 84 B.R. at 984. That such an offer is insufficient is emphasized by Barclay's ICC contract carrier permit, which states that "[w]hile the execution of contracts must be accomplished, it is unnec-

---

**8.** Two shipments from and to the same destinations does not constitute a "series of shipments," as is contended by Stewart. If Stewart's view was adopted, the nature of the relationship would be fundamentally changed if, under the same facts, the transportation only involved one of the pieces of equipment, or if it had been possible to ship the two pieces on one truck. This result could not be the intention behind 49 C.F.R. 1053.1 (1990).

essary to file them with the Commission." It may well be that under common law principles, there existed a contract between Barclay and Stewart. It is clear, however, that the existence of a contract does not establish and prove the existence of contract carriage. *Contracts for Transp. of Property*, 56 Fed.Reg. 9339 (1991) (announced March 6, 1991); *MCI Telecommunications Corp. v. E.L. Murphy Trucking Co. and Sunbelt Freight Traffic Serv., Inc.*, No. MC-C-30115 (June 22, 1989) (1989 WL 238880, LEXIS, Trans library, ICC file) (ICC decision). Oral agreements, for example, are agreements for common carriage. *In re Carolina Motor Express, Inc.*, 84 B.R. at 985; *West Coast Truck Lines, Inc. v. Kaiser Aluminum & Chem.*, No. C-87-0048 (N.D.Cal.1987) (WESTLAW, TRANS-CS Database). In fact, even a statement in an alleged contract that the service will be that of a contract carrier does not establish that the parties have met the statutory definition. *MCI Telecommunications Corp. v. E.L. Murphy Trucking Co. & Sunbelt Freight Traffic Serv., Inc.*, No. MC-C-30115 (June 22, 1989) (1989 WL 238880, LEXIS, Trans library, ICC file). Furthermore, the letter created no obligation on the part of Stewart to tender any shipments to Barclay. Finally, Barclay issued bills of lading as common carriers are required to do. *See* 49 C.F.R. § 1051.1 (1990). In sum, therefore, and for all of the reasons discussed above, Barclay provided common carrier services to Stewart.

■ Even though Barclay provided common carriage, it cannot take refuge in the filed rate doctrine because it was not a participant in the tariff upon which it relies. The rigidity of the filed rate doctrine is illustrated by the fact that carriers and shippers are bound by the filed tariff even where it contains a clerical error of which the shipper was aware, and of which the shipper took advantage. *TADMS, Inc. v. Consolidated Freightways*, 619 F.Supp. 385, 390–91 (C.D.Cal.1985). It is true that a minor filing irregularity will not cause a tariff to be treated as nonexistent. *Providence & Worcester R.R. v. United States*,

666 F.2d 736, 744 (1st Cir.1981); *Genstar Chem. Ltd. v. Interstate Commerce Comm'n*, 665 F.2d 1304, 1308 (D.C.Cir. 1981), *cert. denied*, 456 U.S. 905, 102 S.Ct. 1750, 72 L.Ed.2d 161 (1982). Barclay's failure to be on file for nearly one year, however, is not a mere technicality that can be overlooked.

Barclay relies heavily on the decision in *Hull & Smith Horse Vans, Inc. v. Carras* to support his "technical lapse" theory. *See* 144 Mich.App. 712, 376 N.W.2d 392 (1985), *cert. denied*, 479 U.S. 822, 107 S.Ct. 91, 93 L.Ed.2d 43 (1986). *Hull* involved a suit brought by a carrier that had transported horses for the defendant shipper. The carrier, however, lacked a certificate of public convenience and necessity for the routes that it had used to transport the horses, and thus, the tariff itself was inapplicable. *Hull & Smith Horse Vans, Inc.*, 376 N.W.2d at 394. Nonetheless, the carrier was permitted to receive the rates specified on the bills of lading. To support its position, Barclay points to the court's statement that "plaintiff recovered the same amount to which it would have been entitled if it had possessed the applicable interstate certificates or tariffs." *Id.* at 393. Barclay's reliance on this language is misplaced, however, because the plaintiff carrier in *Hull* had entered on the bills of lading the rates found in the standard rate schedule of the National Horse Carriage Association. Thus, the court did not apply the tariff rate per se, but rather, enforced as contracts the bills of lading which set forth the tariff rate as the applicable rate. *Id.* at 395 ("The price terms of the contracts contained nothing inconsistent with federal requirements.").

Barclay simply cannot require Stewart to pay the rate contained in a tariff in which Barclay was not participating. The rationale for the filed rate doctrine is that shippers are put on notice of the lawful rate by virtue of a proper filing. *Fry Trucking Co. v. Shenandoah Quarry, Inc.*, 628 F.2d 1360, 1363 (D.C.Cir.1980). Thus, where the carrier fails to file a tariff, that tariff and its rate are unenforceable as a matter of law. *Puerto Rico Maritime Shipping*

*Auth. v. Valley Freight Sys., Inc.,* 856 F.2d 546, 548 (3d Cir.1988); *Fry Trucking Co.,* 628 F.2d at 1360; *Mars Express, Inc. v. David Masnik, Inc.,* 401 F.2d 891, 894 (2d Cir.1968). The illegality of the transportation due to such a failure to file does not mean that the transportation was not common carriage. *Ensco, Inc.,* 689 F.2d at 926. Accordingly, Barclay's motion for summary judgment on Count I of its complaint should be denied and Stewart's cross-motion for partial summary judgment should be allowed. Likewise, because the tariff is inapplicable, Barclay's motion for summary judgment on Count Two of Stewart's counterclaim based on a contract theory should be denied also.

■ The result of this determination is that the dispute will be decided on common law contract principles.[9] Although the situation at bar is unusual, there is authority for the proposition that the violation of the filing requirements does not render unenforceable a contract between a carrier and a shipper. *See Ets–Hokin & Galvan, Inc. v. Maas Transp., Inc.,* 380 F.2d 258, 261 (8th Cir.), *cert. denied,* 389 U.S. 977, 88 S.Ct. 481, 19 L.Ed.2d 471 (1967); *Concord Indus., Inc. v. K.T.I. Holdings, Inc.,* 711 F.Supp. 728, 730 (E.D.N.Y.1989); *Hull & Smith Horse Vans,* 376 N.W.2d at 394; *see also Fry Trucking Co.,* 628 F.2d at 1364 (court would not compel carrier to refund amounts for services performed outside the scope of its authority); *Chicago and N.W. Transp. Co.—Petition for Declaratory Order—Movement of New Empty Tank Cars,* No. 40158 (April 3, 1989) (1989 WL 238286, LEXIS, Trans library, ICC file) (even if carrier had operated without a filed tariff, carrier would be entitled to a reasonable charge for its services). The rationale for these decisions is that while the carrier may be susceptible to adverse action by the ICC for violations of the filing requirements, the Act itself does not reveal any intent on the part of Congress to void private contracts. *See Concord Indus., Inc.,* 711 F.Supp. at 730.

■ The issue of whether the case should be referred to the ICC under the doctrine of primary jurisdiction must be addressed at this point. Contrary to its name, the doctrine of primary jurisdiction is actually a deference doctrine. *Mashpee Tribe v. New Seabury Corp.,* 592 F.2d 575, 580 n. 1 (1st Cir.), *cert. denied,* 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979). The doctrine is not a rigid one, but has been called a "flexible tool" by the First Circuit. *National Tank Truck Carriers, Inc. v. Burke,* 608 F.2d 819, 821 (1st Cir. 1979) (quoting *Locust Cartage Co., Inc.,* 430 F.2d at 340 n. 5). Its purpose is to foster proper relationships between courts and the administrative agencies overseeing particular regulatory areas. *Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 303, 96 S.Ct. 1978, 1986, 48 L.Ed.2d 643 (1976). Accordingly, courts have held that the ICC does not have the authority to interpret or enforce contracts. *Detroit, Toledo & Ironton v. Consolidated Rail Corp.,* 727 F.2d 1391, 1395 (6th Cir.1984). This conclusion makes sense, given that it is within the conventional competence of courts to apply contracts.

Based on the current posture of the parties, this Court sees no reason at the present time to refer the dispute to the ICC under the theory that the ICC has primary jurisdiction. The parties' main dispute concerns the question of who was responsible for the delay. As to this question, there is clearly a material dispute of fact. Although Stewart points to Barclay's incompetence as being responsible for the delay, it is unclear to what extent Barclay relied on Stewart's representations of what type of equipment the transportation required. If either party can show at a later time that referral of a particular issue is necessary, this Court would consider it at that time. Either party may make such a motion by filing a brief within thirty days. The brief should address the propriety of referring to the ICC that issue or issues, and the best procedure for doing so.

---

**9.** Stewart suggests in its memorandum that Maine law applies. This Court reaches no conclusion at this point as to the governing law.

## IV.

The final issue to be disposed of is Barclay's motion for summary judgment on Count One of Stewart's counterclaim for damage to the cargo. Barclay states that the claim is time-barred. The Act states that a carrier shall provide for a period no shorter than nine months for filing a claim against it, or a minimum of two years for filing a civil action. 49 U.S.C. § 11707(e) (1990); *Nedlloyd Lines, B.V. Corp. v. Harris Transp.*, 922 F.2d 905, 907 n. 2 (1st Cir.1991). The regulations provide that such a claim must be filed with the carrier "within the specified time limits applicable thereto and as otherwise may be required by law, the terms of the bill of lading or other contract of carriage, and all tariff provisions applicable thereto." 49 C.F.R. § 1005.2 (1990). Thus, it is clear that carriers may include in their bill of lading a requirement that any claim of cargo damage be brought within a set time period greater than, or equal to, nine months. *Urban Elec. Co. v. Cable Index*, 735 F.Supp. 29, 31 (D.Mass.1990).

Barclay's bills of lading did not set forth a limitation period. The bills of lading issued were the short form, straight bill of lading. They stated that "every service to be performed hereunder shall be subject to all the terms and conditions of the Uniform Domestic Straight Bill of Lading set forth (1) in Official, Southern, Western and Illinois Freight Classifications in effect on the date hereof, if this is a rail or rail-water shipment, or (2) in the applicable motor carrier classification or tariff if this is a motor carrier shipment." Thus, a tariff is not part of the bill of lading, but rather, is incorporated by reference. *Rohner Gehrig Co. v. Tri–State Motor Transit*, 923 F.2d 1118, 1120 (5th Cir.1991). Put another way, a provision such as that contained in Barclay's bills of lading simply incorporates the time limitations set forth in the filed tariffs. *See Acoustical Ceiling Accessories Co. v. McNicholas Transp. Co.*, 1980–82 Fed.Carr.Cases (CCH) ¶ 82,996 (January 8, 1982); *Sydnor &*

*Hundley, Inc. v. Wilson Trucking Corp.*, 213 Va. 704, 194 S.E.2d 733 (1973); *Wells & Coverly, Inc. v. Red Star Express Lines, Inc.*, 62 Misc.2d 269, 306 N.Y.S.2d 710, 712 (1969).

Barclay relies on the case of *Norca Corp. v. Pilot Freight Carriers, Inc.* for the proposition that the terms of the uniform bill of lading control even where no bill of lading is issued. *See* 63 Misc.2d 684, 313 N.Y.S.2d 232 (1970). The court in *Norca Corp.* did apply the nine-month limitation period of the uniform bill of lading, but only because it was published and filed in the carrier's tariff. *Id.*, 313 N.Y.S.2d at 235. The tariff Barclay relies upon established a nine month limitations period for filing claims for cargo damage. As discussed previously, however, Barclay did not participate in this tariff during the relevant time period. Consequently, there was no applicable tariff on file that was incorporated by the bills of lading. The appropriate statute of limitations, therefore, would be six years, as established under state law.[10] Accordingly, Barclay's motion for summary judgment on Count One of Stewart's counterclaim should be denied.

For all of the reasons stated above, Barclay's motion for summary judgment on Count One of its complaint, and on Counts One and Two of Stewart's counterclaim should be denied. Stewart's motion for partial summary judgment on Count One of Barclay's complaint should be allowed.

Order accordingly.

---

10. A six year limitations period would apply under either Maine or Massachusetts law. *See* Me.Rev.Stat.Ann. tit. 14, § 752 (1988); Mass. Gen.L. ch. 260, § 2 (1959).