**TRANSRISK CORPORATION, INC.,**
Assignee of Allegheny Freight
Lines, Inc., Plaintiff,

v.

**GOODYEAR TIRE & RUBBER,**
Defendant.

Civ. No. N–92–463.

United States District Court,
D. Maryland.

Nov. 5, 1992.

Robert B. Walker, Joseph L. Steinfeld, John T. Siegler, Sims, Walker and Steinfeld, Washington, DC, for plaintiff.

William M. Jacobs, Kroll & Tract, Baltimore, MD, for defendant.

### *MEMORANDUM OPINION*

NORTHROP, Senior District Judge.

Pending before the Court are several motions from Plaintiff and Defendant. Plaintiff has filed a Motion to Dismiss Defendant's Counterclaim (Paper No. 6) and a Motion for Summary Judgment (Paper No. 11). Defendant has filed a Cross Motion for Summary Judgment, or in the alternative, a Motion to Stay and Referral to the Interstate Com-

merce Commission (Paper No. 14). After reviewing the pleadings, this Court determines that no hearing is necessary. Local Rule 105.6. After consideration of all of the arguments contained in the papers filed, this Court will grant Defendant's Motion to Stay the case and Refer to the Interstate Commerce Commission.

## I. *Background*

The underlying basis of this action is fairly straight forward. Plaintiff, Transrisk Corporation ("Transrisk") seeks $9,710.38 in alleged freight "undercharges" from Defendant Goodyear Tire and Rubber Company ("Goodyear"). Plaintiff is an assignee of the receivables of Allegheny Freight Lines ("Allegheny"), a bankrupt motor carrier. Allegheny carried over $250,000 worth of Goodyear freight in its 3,336 shipments. These shipments occurred over a three year period and were made in accordance to agreements between Goodyear and Allegheny.

In January of 1990, Allegheny sought reorganization with its creditors pursuant to Chapter 11 of the United States Bankruptcy Code. The Bankruptcy Court approved a sales agreement and freight audit contract whereby Transrisk was to conduct an audit of Allegheny's freight bills for the purpose of determining whether the bills had been properly rated according to the tariffs filed by Allegheny with the Interstate Commerce Commission ("ICC"). If Transrisk uncovered any balances due Allegheny, Transrisk could collect them as Allegheny's assignee.

There is no allegation that Defendant failed to make proper payment, or did not abide by any of the terms of the agreements between Allegheny and Goodyear. Instead, Transrisk claims that the negotiated rate arrived at between Allegheny and the Defendant was not made in accordance with the tariffs on file with the ICC. 49 U.S.C. § 10761 and § 10762. Transrisk, as assignee, claims that Allegheny should have charged Goodyear more for carrying Defendant's shipments in spite of the terms of the agreements between Goodyear and Allegheny.

Transrisk's argument rests on application of the "filed rate doctrine." This doctrine arises out of the requirement that a common carrier:

> may not charge or receive a different compensation for that transportation or service than the rates specified in the tariff.

49 U.S.C. § 10761(a). Violation of this statute can result in the imposition of civil as well as criminal penalties. 49 U.S.C. §§ 11901–17.

The "filed rate doctrine" was recently reaffirmed by the Supreme Court.

> Under the Interstate Commerce Act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they, as well as the carrier, must abide by it unless it is found by the Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the filed rate.

*Maislin Industries, U.S., Inc.*, 497 U.S. 116, 126, 110 S.Ct. 2759, 2766, 111 L.Ed.2d 94 (citations omitted).

The broad purpose of the "filed rate doctrine" is to prevent unjust discrimination against smaller shippers and harmful competition among carriers. *See Dan Barclay, Inc. v. Stewart & Stevenson Services*, 761 F.Supp. 194, 198 (D.Mass.1991). It is believed that by requiring public notice of the rates charged and providing shippers with an opportunity to protest, the filed rate doctrine insures stability of the motor carrier industry. *Id.* Shippers are charged, therefore, with constructive notice of the applicable rate. *In re Carolina Motor Express, Inc.*, 84 B.R. 979, 990 (W.D.N.C.1988).

In response to Plaintiff's argument on the filed rate doctrine, Defendant claims that its shipments with Allegheny were pursuant to Allegheny's status as a contract carrier. Further, Defendant argues that even if it was not a contract carrier, the filed rates that Allegheny were charged are unreasonable. Finally, Defendant counterclaims for negligence and breach of contract in that Defendant alleges that Plaintiff did not properly file the rates that were contained in the agreement between Plaintiff and Defendant.

## II. *Analysis*

### A. *Defendant's Motion for Summary Judgment, or in the alternative, for Stay and Referral to the Interstate Commerce Commission*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. Regarding materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Regarding genuineness, a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

The party seeking summary judgment bears the initial burden to show that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). This burden does not require the moving party to produce *evidence* showing the absence of a genuine issue of material fact, but only to point out the absence of a material fact. *Id.* (emphasis added).

In responding to the defendant, the adverse (non-moving) party, in this case the plaintiff, "may not rest upon the mere allegations or denials of the adverse party's pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

The Supreme Court has stated that "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. The mere existence of a scintilla of evidence in support of the non-moving party's case will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. The evidence of the non-moving party is to be believed and all justifiable inferences are to be drawn in the non-moving party's favor. *Id.* (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)).

Defendant contends that it is relieved of its obligations to pay the filed rates because shipments were made pursuant to Allegheny's status as a contract carrier. Plaintiff alleges that the written agreement between Allegheny and the Defendant does not meet the statutory or ICC requirements for contract carrier status.

The ICC, through the exercise of its statutory authority has exempted certain carriers from requirements of the "filed rate doctrine." [1] *Exemption of Motor Contract Carriers from Tariff Filing Requirements,* 133 M.C.C. 150 (1983), *aff'd sub nom. Central & S. Motor Freight Tariff Association v. U.S.,* 757 F.2d 301 (D.C.Cir.) *cert. denied,* 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985). Under the Act, a "motor contract carrier" is defined as:

> a person providing motor vehicle transportation of property for compensation under continuing agreements with one or more persons—
>
> (i) by assigning motor vehicles for a continuing period of time for the exclusive use of each such person; or
>
> (ii) designed to meet the distinct needs of each such person.

49 U.S.C. § 10102(15)(B). Moreover, the ICC enacted a regulation defining "continuing agreements":

---

1. The Interstate Commerce Act provides:
   "The Commission may grant relief from [the filed rate doctrine tariff requirements] to contract carriers when relief is consistent with the public interest and the transportation policy ..." 49 U.S.C. §§ 10761(b), 10762(f).

No contract carrier, by motor vehicle, as defined in 49 U.S.C. § 10102(15) shall transport property for hire ... except under special and individual contracts or agreements which shall be in writing, shall provide for transportation for a particular shipper or shippers, shall be bilateral and impose specific obligations upon both carrier and shipper or shippers, shall cover a series of shipments during a stated period of time in contrast to contracts of carriage governing individual shipments ...

49 C.F.R. § 1053.1. It should be noted that the Act also defines a common carrier:

A person holding itself out to the general public to provide motor vehicle transportation for compensation over regular or irregular routes, or both.

49 U.S.C. § 10102(14).

In this case, Allegheny had authority from the ICC to operate as both a contract carrier and a common carrier. In order to evaluate Defendant's claims, the Court will examine the Allegheny and Goodyear carriage agreements to see if they meet statutory and ICC regulatory requirements for contract carriage. If the agreements meet contract carriage requirements, then Plaintiff's reliance on the filed rate doctrine is misplaced as the rates specified in the agreements and not the filed rates would apply.

### 1. Distinct Need Requirement

■ First, the Court will consider the requirement that a motor carrier contract provide for a shipper's "distinct needs." A distinct need is defined as a need for more specialized services than a common carrier can provide. *Dan Barclay*, 761 F.Supp. at 200. As the Court in *Dan Barclay* noted, the distinct needs requirement, that helps to distinguish a common carrier from a contract carrier, "becomes hazy" where the carrier, as in this case, has authority to perform both types of service. *Id.* The ICC has attempted to shed some light on the definition of "distinct needs" by noting that while both types of carriers would be meeting distinct needs, "common carriers do not do so on a committed basis and over a continuing period of time." *Interstate Van Lines, Inc., Exten-*

*sion–Household Goods,* 5 I.C.I.2d 168, 1988 WL 225465 (Dec. 6, 1988).

■ In the instant case, the agreement between the parties appears to meet the ICC *Interstate Van Lines* definition of distinct needs. First, Allegheny had both contract and common carriage authority. Second, the shipments were made pursuant to agreements that appear to be committed to carrying Defendant's shipments. Third, shipments were made pursuant to three agreements between Allegheny and Defendant over a continuing period of three years. Under these circumstances, the distinct needs requirement has been held to have been met. *Global Transportation Services v. United Shipping Company,* 134 B.R. 359 (Bankr. D.Minn., 1991) (distinct needs requirement met where carrier obligated itself to carry all shipments tendered by shipper done in accordance to a yearly contract as opposed to a common carrier agreement which only handles individual shipments).

■ In addition to the *Interstate Van Lines* criteria, Defendant offers other reasons for contending that the distinct needs requirement was met. Defendant maintains that the distinct needs requirement was met because Plaintiff was thoroughly familiar with Goodyear's transportation requirements including frequency, dispatching, and nature of products shipped, and equipment requirements. Moreover, Defendant contends that neither the ICC nor federal courts require the recitation of a shipper's distinct needs to be written into the contract. *See Id.* Any number of options or services actually provided by a carrier can qualify as meeting a shipper's distinct needs. *See Interstate Van Lines, Extension–Household Goods,* 5 I.C.C.2d 168, 1989 Fed.Carr.Cas., 1988 WL 225465 (Dec. 6, 1988).

However, as Plaintiff suggests, courts have held that the distinct needs requirement is not met where a written contract between a shipper and a carrier contains only general terms. *See Robert E. Brizendine, Trustee for Brown Transport Truckload, Inc., et al. v. Beatrice/Hunt–Wesson, Inc.,* 142 B.R. 536 (N.D.Ga.1992). Similarly, courts have required contract carriers to provide more specialized services than those provided by a

common carrier. *See Id.* Such services could include special equipment assigned to a shipper. *Id.* Some courts have held that even meeting this requirement may not be enough. *See F.P. Corp. v. Golden West Foods, Inc.,* 807 F.Supp. 1228 (W.D.Va.1992) (distinct needs not met even by a shipper's requirement for refrigerated trucks, prompt delivery and pickup). As such, there is some conflict as to exactly what constitutes distinct needs. The meaning of this term is ambiguous and this ambiguity has led to several different definitions as applied in the courts. Therefore, the I.C.C. should resolve this dispute.

### 2. *Continuing Agreements Requirement*

■ This conflict in defining the elements of what constitutes a contract carriage is also apparent in the continuing agreements requirement. 49 U.S.C. § 10102(15); 49 C.F.R. § 1053.1. Plaintiff contends that the agreement between Allegheny and Goodyear fails to meet the continuing agreement provisions because there is no commitment for the quantity of freight to be carried, and no way to ascertain the exact nature of the party's obligations. *See Dan Barclay,* 761 F.Supp. at 194; *Diversity Wyandotte Cor.—Petition for Declaratory Order,* 1990 Fed.Carr.Rep. (C.C.H.) para. 37,821 (I.C.C. June 4, 1990) (to maintain a contract carriage terms relating to destination, dedication of specific equipment and method of compensation should be written into the contract).

Defendant, however, counters that the contract between Allegheny and Goodyear meets the continuing agreements requirements as set forth in ICC decisions and ICC regulations. 49 C.F.R. § 1053.1. First, the agreements are in writing. *Id.* Courts have held that a written agreement is a necessary requirement for demonstrating contract carriage. *See Covey v. Conagra,* 788 F.Supp. 1160, 1162 (D.Colo.1992); *Dan Barclay,* 761 F.Supp. at 201.

Second, the agreements provide transportation for a particular shipper—the Defendant. 49 C.F.R. § 1053.1. Third, the agreement covers stated periods of time. *Id.* The agreements are for one year. Further, over

three thousand shipments were made in accordance with these agreements.

Finally, although Plaintiff contests this, Defendant maintains that the agreements are bilateral and articulate specific obligations. *See General Mills, Inc.—Petition for Declaratory Order—Certain rates and practices of United Shipping Co., Inc.,* 8 I.C.C.2d 313, 323 (March 9, 1992) ("General Mills"). In *General Mills,* the ICC found that the goods were shipped under the carrier's contract authority even though the agreement did not, as in the instant case, specify the number of shipments. *Id.* at 323. In fact, in *General Mills,* the ICC found that the contract was bilateral because the shipper "agreed to tender shipments to [the carrier] and pay for services provided under contract." *Id.* Under the *General Mills* standard, the agreement appears to be bilateral.

The ICC has stated that where substantial compliance exists in meeting the requirements of 49 C.F.R. § 1053.1, the Commission will not "find a lack of contract carriage based on simple, technical oversights or omissions." *Id.* As the Commission stated, "[o]nce the parties (carrier and shipper) have clearly established that certain transportation is to move under the contract carrier permit, the shipper is entitled to rely on the carrier lawfully to transport it under the permit ..." *Id.*

In the instant case, as in *General Mills,* Goodyear shipped goods under an agreement that clearly indicated that the shipments were made in accordance with Allegheny's contract carriage authority. Unfortunately, other authority has not applied this ICC interpretation of statute and regulatory requirements. *Cf., Id.* and *Dan Barclay,* 761 F.Supp. at 203 (mere existence of a contract between a shipper and a carrier does not automatically establish the existence of contract carriage). As such, the "continuing agreements" requirement is, like the term "distinct needs," ambiguous.

### 3. *Doctrine of Primary Jurisdiction*

Under similar circumstances where statutory ambiguity exists and public policy considerations persist, referral to the ICC is warranted under the Commission's primary

jurisdiction of this issue. *See Atlantis Express, Inc. v. Standard Transportation Services, Inc.*, 955 F.2d 529, 532–33 (8th Cir. 1992).

The doctrine of primary jurisdiction applies:

> whenever enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, had been placed within the special competence of an administrative body; in such a case, the judicial case is suspended pending referral of such issues to the administrative body for its views.

*United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956), citing *General American Tank Car Corp. v. El Dorado Terminal Co.*, 308 U.S. 422, 433, 60 S.Ct. 325, 331, 84 L.Ed. 361 (1940). The Court in *Western* stated that there is no fixed formula for applying the doctrine of primary jurisdiction, and that the doctrine is to be applied on a case by case basis. Factors to be considered by the courts in applying this doctrine are: (1) the desired uniformity that arises when a specialized agency initially passes on certain administrative questions; and (2) the deference that should be given to the expert and specialized knowledge of agencies. *Id.* at 64, 77 S.Ct. at 165, citing, *Texas & Pacific R. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907); *Far East Conference v. United States*, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952).

The factors underlying the Supreme Court's application of the doctrine of primary jurisdiction in *Western* are present here. First, there is ambiguity as to the meaning of concepts central to defining contract carriage. For example, the specialized services required to meet the definition of "distinct needs" requires a more precise meaning. Similarly, the definition of "continuing agreements" must be given a clearer definition. Without a more precise definition of the terms that are central to defining contract carriage, different and inconsistent legal conclusions will derived by different courts reviewing essentially the same contracts.

The ambiguity of meaning in the terms that define contract carriage has already led to results that, at the very least, give the appearance of inconsistency. *Cf. Global Transportation Services v. United Shipping Co.*, 1991 Fed.Carr.Cas. (C.C.H. at 58, 570–571) (The distinct needs requirement was met where contract governed a continuing period and the carrier was under contract on a committed basis) and *Covey*, 788 F.Supp. at 1160 (Distinct needs required a showing that shipments are special or that the transportation that the carrier provides is unusual).

Second, questions of policy, a policy that is within the jurisdiction of the ICC, must guide the construction of these terms. In reviewing the definition of these terms, this Court is not simply dealing with an interpretation of the law. Nor is the Court only examining the validity of a contract. The ICC has authority to grant relief from the application of the "filed rate doctrine" and issue a carrier's motor contract carriage authority. This ICC authority must be exercised in accordance with a statute that explicitly requires agency evaluation of "the public interest" and the interpretation of "transportation policy." 49 U.S.C. §§ 10761(b), 10762(f). This authority was upheld by the Supreme Court in *Maislin.*

Moreover, it is not simply a question of standard contract law interpretation. Motor contract carriage is defined by a statute that requires fulfilling conditions that are not present in common law. The motor contract carriage requirements that a contract must meet a shipper's "distinct needs" or be part of the "continuing agreements" between a shipper and a carrier are creatures of statutory creation, not common law evolution.

Whether the ICC or the courts choose to define these terms narrowly or broadly has important considerations for public policy. A narrow reading of the terms that define contract carriage requires careful articulation. Otherwise, the ability of shippers to rely on the contract carriage authority of carriers is undermined.

If a shipper, or its successor in interest, can unilaterally rewrite the rates paid by the shipper in order to take advantage at a later date of the higher filed tariffs, the important

principles that protect expectancy interests that underline contract law are undermined. *See General Mills* at 321.[2] Participants in a contract should be able to secure the benefit of their bargain. Unless the ambiguity is cleared and these terms clearly defined, neither shippers nor carriers will be able to develop reasonable expectations of one of the central terms of any contract, *i.e.*, price. The validity of written agreements will be jeopardized.

On the other hand, if the definition of these terms is read too broadly, there is a potential for circumventing the "filed rate doctrine." For then, any type of agreement would meet the doctrine's requirements. Prior attempts by the ICC to relax the requirements of the "filed rate doctrine" have been stricken by the Supreme Court. *See Maislin,* 497 U.S. 116, 110 S.Ct. 2759. In *Maislin,* the court struck the ICC's policy of allowing parties to rely on negotiated rates that were inconsistent with the filed tariff rates. *Id.* If a motor contract carrier, under 49 U.S.C. § 10102(15), is interpreted too broadly, the court could reach a similar conclusion as in *Maislin,* as the parties use a contract carriage authority to negotiate rates at variance with filed tariffs.

Third, the Supreme Court has held that "the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong ..." *CBS v. FCC,* 453 U.S. 367, 382, 101 S.Ct. 2813, 2823, 69 L.Ed.2d 706 (1981) (quoting from *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969). It is the ICC which is charged with the execution of this statute. *Atlantis Express,* 955 F.2d at 532–33. Therefore, given that the uniformity of statutory and regulatory construction would be promoted and that these issues raise questions of policy that are within the expertise of the ICC, referral to that agency is appropriate in this case. *See Western Pacific R.R.,* 352 U.S. at 63–64, 77 S.Ct. at 164–65; *Atlantis Express,* 955 F.2d at 532–33.

Finally, Plaintiff argues, in part, that staying this case while it is referred to the ICC is inappropriate given the Fourth Circuit's ruling in *In re Carolina Motor Express, Inc.,* 949 F.2d 107 (4th Cir.1991). This Court does not believe that decision applies to this situation. *In re Carolina Motor Express, Inc.* dealt with a shipper's challenge to the reasonableness of the filed tariffs. Here, the issue involved the determination of whether the shipper and carrier were operating pursuant to motor contract carriage authority. If the shipper was operating pursuant to a contract, then the filed rates do not apply.

In this case, the agreement between Allegheny and Goodyear states that the parties are operating under contract authority and not the filed tariffs. Therefore, the Fourth Circuit's justification for requiring the shipper to pay the carrier first and then take its case to the ICC does not apply. Because shippers are charged with knowledge of the filed rates, the Court in *In re Carolina Motor Express, Inc.* held that it was certainly not inequitable to require shippers to pay the proper prices for common carriage and then sue for the difference.

The same rationale leads to a different conclusion in the instant case. For while shippers are charged with knowledge of the filed rates, Goodyear was operating, with knowledge of, and in reliance upon, what it thought to be a valid contract that specified rates other than the tariffs. The ICC authorized Allegheny's motor contract carriage authority and the goods were shipped pursuant to the contract.

### III. *Conclusion*

For the foregoing reasons, this Court will grant Defendant Goodyear's Motion to Stay the Case and referral to the ICC.

All other Motions are stayed pending the outcome of the ICC's decision.

---

2. "We will not look with favor upon contract carriers or their successors in interest contending in undercharged proceedings that a carrier's failure to fulfill obligations under the contract and permit transforms the transportation services intended by the parties to be contract carriage into common carriage, subject to unintended filed common carriage tariff rates." *Id.* at 321.